IN THE SUPREME COURT OF PENNSYLVANIA
EASTERN DISTRICT

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| HIKO ENERGY, LLC, | : | No. 39 EAP 2017 |
| | : | |
| Appellant | : | Appeal from the Order of |
| | : | Commonwealth Court entered on |
| | : | June 8, 2017 at No. 5 CD 2017 |
| v. | : | affirming the Order entered on |
| | : | December 3, 2015 by the |
| | : | Pennsylvania Public Utility |
| PENNSYLVANIA PUBLIC UTILITY | : | Commission at No. C-2014-2431410. |
| COMMISSION, | : | |
| | : | ARGUED: September 26, 2018 |
| Appellee | : | |

## OPINION

**JUSTICE MUNDY**                                          **DECIDED: June 5, 2019**

In this appeal by allowance, we consider whether the penalty imposed against HIKO Energy, LLC (HIKO) was so grossly disproportionate as to violate the Excessive Fines Clause of the Pennsylvania and U.S. Constitutions; whether the penalty impermissibly punished HIKO for litigating; and whether the Pennsylvania Utility Commission (PUC) abused its discretion in imposing a penalty which was not supported by substantial evidence. We conclude that HIKO waived its constitutional challenge to the civil penalty in this case, the penalty was not imposed as a punishment against HIKO for opting to litigate its case, and that the PUC's conclusions in support of imposing the penalty are supported by substantial evidence.

## I.    Background

This matter originates with the PUC's Bureau of Consumer Services (BCS) receiving numerous customer complaints alleging HIKO, an electric energy supplier, had overcharged customers in Pennsylvania during the polar vortex in the winter months of 2014.[1] Based on extensive customer complaints, the PUC's Board of Investigation and Enforcement (I&E) instituted an informal investigation into HIKO in March 2014.

Relevant to the investigation, it was determined that in August 2013, HIKO offered a variable rate plan that included a six-month introductory price guarantee. As part of this offer, in its welcome letter and disclosure statement, HIKO guaranteed customers it would charge 1-7% less than the rate offered by customers' local electric distribution company (EDC) for the first six monthly billing cycles.[2] HIKO referred to this metric as the price-to-compare (PTC), or the rate, which, at any given time, was being offered by a customer's EDC. The disclosure statement, which, in addition to the welcome letter, was also sent to customers enrolling in the variable rate plan, further stated that the rate was the "price

---

[1] HIKO was temporarily operating as an electric generation supplier (EGS) pursuant to an order from the PUC conditionally approving a license to supply services to all electric distribution company (EDC) service territories in Pennsylvania. The temporary license was valid for 18 months, from December 2012 through June 2014. Additionally, the license was conditioned upon reporting requirements regarding HIKO's sales and marketing practices, and was based on the discovery that a high number of complaints were filed against HIKO in New York. Administrative Law Judges' (ALJs) Initial Decision, 8/21/15, at 3.

[2] Specifically, HIKO's welcome letter sent to customers enrolling in the variable rate plan stated:

> **Guaranteed Savings!** You have been enrolled onto a variable rate, which is <u>guaranteed to be 1-7% less than your local Utility's price to compare</u>, for the first six monthly billing cycles. After the six-month introductory rate plan, you will be automatically rolled over onto a competitive variable rate, which will be determined by [HIKO], based on numerous key factors, including current market conditions and climate. The variable rate can change regularly.

ALJs' Initial Decision, 8/21/15, at ¶ 45 (emphasis in original).

stated at sign-up and confirmed in your written Welcome Letter from HIKO." ALJs' Initial Decision, 8/21/15, at ¶ 46.

Prior to the polar vortex, HIKO purchased electricity from PJM Interconnection LLC (PJM)[3] for approximately $0.08 per kWh. Due in part to the increased demand for electricity, the price nearly tripled to $0.227 per kWh in January 2014, and stayed at or above $0.138 per kWh until the end of March 2014. As a result of these increases, HIKO experienced an unexpected increase in the price of spot market wholesale electricity, and faced difficulty in obtaining electric power supply at the rates required under its business model. Ultimately, this resulted in HIKO overcharging around 5,700 of its customers enrolled in the guaranteed savings plan by approximately $1.8 million. ALJs' Initial Decision, 8/21/15, at ¶ 27.

Following the completion of the informal investigation, in July 2014, I&E filed a complaint against HIKO alleging that during the 2014 polar vortex, HIKO had overcharged 5,708 customers on 14,780 invoices. I&E posited that each of these 14,780 overcharges constituted a violation of 52 Pa. Code § 54.4(a), which requires that the billed prices reflect the marketed prices.[4] I&E requested a civil penalty of $14,780,000.00 against HIKO, or $1,000.00 per violation of Section 54.4(a). Further, I&E requested the PUC revoke HIKO's authority to operate as an EGS in Pennsylvania and order HIKO to provide a refund to each Pennsylvania customer. HIKO responded by filing an answer, new matter, and preliminary objections. In its Answer, HIKO alleged that if the administrative law

---

[3] "PJM is a regional transmission organization that coordinates the movement of wholesale electricity in 13 states (including Pennsylvania) and the District of Columbia." *Metro Edison Co. v. Pa. Pub. Util. Comm'n*, 22 A.3D 353, 356 n.4 (Pa. Cmwlth. 2011) (en banc).

[4] Specifically, 52 Pa. Code § 54.4(a) requires that "EGS prices billed must reflect the marketed prices and the agreed upon prices in the disclosure statement."

judges (ALJs) found any violations occurred, "the Complainant's requested relief is grossly disproportionate to said violations." HIKO's Answer to I&E's Complaint, 7/31/14, New Matter at ¶ 11. The ALJs overruled HIKO's preliminary objections.[5]

The complaint filed by I&E culminated in a hearing involving the parties.[6] At the hearing, HIKO's CEO, Harvey Klein, testified that during the 2014 polar vortex, HIKO was unable to honor its commitment to beat the price to compare of other EGS companies. N.T., 4/20/15, at 165 (Testimony of Harvey Klein). In fact, Klein asserted, "it was simply impossible for us to stay in business while continuing to beat the price to compare." Pre-served Rebuttal Testimony of Harvey Klein, 3/13/15, at 9. Accordingly, with Klein's knowledge and approval, HIKO deviated from the terms of its price guarantee, and charged customers at rates higher than what was guaranteed in HIKO's disclosure statement and welcome letter. N.T., 4/20/15, at 165-66 (Testimony of Harvey Klein).

---

[5] During this same time period, the Commonwealth, acting through its Attorney General through the Bureau of Consumer Protection (OAG) and the Acting Consumer Advocate (collectively OAG/OCA) filed a joint complaint against HIKO. In the complaint, OAG/OCA accused HIKO of engaging in misleading marketing and improper billing, and requested restitution, revocation of HIKO's EGS license, and a prohibition on future deceptive practices. HIKO and OAG/OCA eventually reached a settlement approved by the ALJs. As part of that settlement, HIKO agreed to: (1) make restitution payments to overcharged customers; (2) cease accepting new customers until at least June 30, 2016; and (3) make a $25,000 contribution to the local EDC's hardship funds. The restitution aspect of the agreement mandated HIKO would create a refund pool of $2,025,383.85, which, in addition to the $159,320.15 in refunds HIKO had already provided, would ensure HIKO customers received refunds equaling a 3.5% savings from their respective PTC rates for the polar vortex months.

[6] I&E presented the testimony of Daniel Mumford, manager of the PUC's Bureau of Consumer Services' Informal Compliance and Competition Unit, along with documentary evidence. HIKO presented the testimony of its CEO, Harvey Klein, and rebuttal testimony of expert witness Charles J. Cicchetti, Ph.D. (Cicchetti). Dr. Cicchetti is an independent consultant with a background in economics and utility regulation.

In February 2014, HIKO began instituting voluntary refunds to customers who complained and ultimately refunded approximately $160,000 to customers in Pennsylvania. Pre-served Rebuttal Testimony of Harvey Klein, 3/13/15, at 13. Around this same time, HIKO adjusted its business model, and it now purchases some energy under longer term contracts in order to hedge against sudden increases in wholesale prices. N.T., 4/20/15, at 167 (Testimony of Harvey Klein). Additionally, HIKO has ceased offering the variable rate price guarantee to Pennsylvania customers. Pre-served Rebuttal Testimony of Harvey Klein, 3/13/15, at 13.

As part of I&E's investigation, HIKO provided I&E with billing data for EGS it supplied to residential customers within each EDC service territory[7] in which it operates and billed from January through April 2014. Klein testified to the authenticity of these documents and agreed that the spreadsheets HIKO produced represented billing data for HIKO customers enrolled in the price guarantee program. N.T., 4/20/15, at 147 (Testimony of Harvey Klein). Klein further agreed that the lines in the spreadsheets which represented an overcharge were highlighted. N.T., 4/20/15, at 153 (Testimony of Harvey Klein). Based on the documents HIKO provided, I&E's investigation eventually uncovered that HIKO overcharged 5,708 customers on 14,689 invoices.[8] ALJs' Initial Decision, 8/21/15, at ¶ 67; Pre-served Direct Testimony of Daniel Mumford, 12/23/14, at 16, 21, 45. At no point during the proceedings did HIKO provide updated or corrected billing spreadsheets. Pre-served Direct Testimony of Daniel Mumford, 12/23/14, at 19.

---

[7] This included customers in the service territories of Duquesne Light Company, Metropolitan Edison Company (Met-Ed), Pennsylvania Electric Company (Penelec), PPL Electric Utilities (PPL), West Penn Power Company, and PECO.

[8] Although I&E initially alleged HIKO had committed 14,780 violations, after its investigation, this number changed to 14,689 overcharges. ALJs' Initial Decision, 8/21/15, at ¶ 67. Notwithstanding this distinction, the Commonwealth Court and the parties' briefs assert that I&E initially alleged 14,689 violations.

At the conclusion of the hearing, the ALJs issued a decision finding that HIKO had intentionally billed customers at a rate higher than what was guaranteed in HIKO's welcome letter and disclosure statement. Further, the ALJs reasoned that HIKO was aware that it failed to honor the price offering when it broke the guarantee. The ALJs determined that HIKO made the affirmative decision to remain in business by intentionally overcharging its Pennsylvania customers in excess of the rate it had previously guaranteed. This overcharging occurred, the ALJs noted, while HIKO's license was subject to the reporting conditions outlined in the initial order granting HIKO its license.

The ALJs also recognized that had HIKO abandoned its Pennsylvania business instead of overcharging its customers, the affected customers would have been transferred to local EDCs and would not have been deprived of electricity during the polar vortex. Additionally, any customers that HIKO dropped would have actually saved money, because the local EDCs were charging their customers much lower rates throughout the duration of the polar vortex. ALJs' Initial Decision, 8/21/15, at ¶ 28. Moreover, the ALJs found that HIKO did not voluntarily offer refunds to customers; rather, HIKO initially issued refunds only to customers who had complained directly to HIKO or through a government agency.

At the conclusion of the hearing, the ALJs granted, in part, I&E's complaint, while denying the requests for customer refunds as moot based on the settlement reached between HIKO and OAG/OCA. The ALJs further denied I&E's request for revocation of HIKO's EGS license, again noting the terms of the settlement reached between HIKO and OAG/OCA.

Additionally, the ALJs granted I&E's request to impose a civil penalty on HIKO pursuant to Section 3301 of the Public Utility Code, 66 Pa.C.S. § 3301. Although the ALJs did not impose the approximately $14,700,000.00 penalty I&E initially sought based

on a $1,000.00 penalty per overcharge invoice, they directed HIKO to pay a civil penalty of $1,836,125.00. This amount was calculated by multiplying the number of violations of 52 Pa. Code § 54.4(a) (14,689) with the approximate average overcharge per invoice ($125.00). The ALJs justified this penalty based largely on HIKO's conscious decision to disregard the price guarantee made to its customers. Further, the ALJs considered the ten factors which impact the imposition of a fine for violation of a PUC order, regulation, or statute listed in 52 Pa. Code § 69.1201. Section 69.1201 states:

> **§ 69.1201. Factors and standards for evaluating litigated and settled proceedings involving violations of the Public utility code and [PUC] regulations-statement of policy.**
>
> (a) The [PUC] will consider specific factors and standards in evaluating litigated and settled cases involving violations of 66 Pa.C.S. (relating to Public Utility Code) and this title. These factors and standards will be utilized by the [PUC] in determining if a fine for violating a [PUC] order, regulation or statute is appropriate, as well as if a proposed settlement for a violation is reasonable and approval of the settlement agreement is in the public interest.
>
> (b) Many of the same factors and standards may be considered in the evaluation of both litigated and settled cases. When applied in settled cases, these factors and standards will not be applied in as strict a fashion as in a litigated proceeding. The parties in settled cases will be afforded flexibility in reaching amicable resolutions to complaints and other matters so long as the settlement is in the public interest. The parties to a settlement should include in the settlement agreement a statement in support of settlement explaining how and why the settlement is in the public interest. The statement may be filed jointly by the parties or separately by each individual party.
>
> (c) The factors and standards that will be considered by the [PUC] include the following:
>
>> (1) Whether the conduct at issue was of a serious nature. When conduct of a serious nature is involved, such as willful fraud or misrepresentation, the conduct may warrant a higher penalty. When the conduct is

less egregious, such as administrative filing or technical errors, it may warrant a lower penalty.

(2) Whether the resulting consequences of the conduct at issue were of a serious nature. When consequences of a serious nature are involved, such as personal injury or property damage, the consequences may warrant a higher penalty.

(3) Whether the conduct at issue was deemed intentional or negligent. This factor may only be considered in evaluating litigated cases. When conduct has been deemed intentional, the conduct may result in a higher penalty.

(4) Whether the regulated entity made efforts to modify internal practices and procedures to address the conduct at issue and prevent similar conduct in the future. These modifications may include activities such as training and improving company techniques and supervision. The amount of time it took the utility to correct the conduct once it was discovered and the involvement of top-level management in correcting the conduct may be considered.

(5) The number of customers affected and the duration of the violation.

(6) The compliance history of the regulated entity which committed the violation. An isolated incident from an otherwise compliant utility may result in a lower penalty, whereas frequent, recurrent violations by a utility may result in a higher penalty.

(7) Whether the regulated entity cooperated with the [PUC's] investigation. Facts establishing bad faith, active concealment of violations, or attempts to interfere with [PUC] investigations may result in a higher penalty.

(8) The amount of the civil penalty or fine necessary to deter future violations. The size of the utility may be considered to determine an appropriate penalty amount.

(9) Past [PUC] decisions in similar situations.

(10) Other relevant factors.

52 Pa. Code § 69.1201.

Both parties filed exceptions. In its exceptions, HIKO asserted, among other things, that "the requested civil penalty . . . [was] disproportionate to the alleged violations", and was higher than the penalty imposed on other EGSs in what HIKO asserts are factually similar matters. *See* Exceptions of HIKO Energy, LLC to Initial Decision, 9/10/15, at 7, 30-31, 33. In its Reply to I&E's Exceptions, HIKO alleged "that significantly lower civil penalties have been levied against much larger companies for more egregious conduct" and characterized the proposed penalty as "grossly disproportionate." *See* Replies of HIKO Energy, LLC to Exceptions of I&E, 9/21/15, at 3, 6, 16-17.

Both parties' exceptions were denied. Subsequently, the PUC adopted the ALJs' decision, imposing a $1,836,125.00 civil penalty on HIKO. In concluding that the penalty was fitting, the PUC recognized that HIKO acted knowingly, deliberately, and "effectively treated its own customers as the financial guarantors of its own business plan, which backed contracts offering customers guaranteed savings with what was essentially a speculative supply portfolio based exclusively on spot market purchases." Commission Opinion, 12/3/15, at 44.

## II.  Commonwealth Court Proceedings

### A.  Majority Opinion

HIKO appealed to the Commonwealth Court and filed an application for stay. In its application for stay, HIKO asserted for the first time that the civil penalty was "unreasonable . . . and violative of the Excessive Fines Clause of Article I, Section 13." [9] Emergency Petition for Supersedeas, 12/18/15, at 6. By single-judge order, the Commonwealth Court granted the application for stay pending the resolution of the

_____

[9] Pa. Const. art. I, § 13.

appeal.  *HIKO Energy, LLC v. Pa. Pub. Util. Comm'n*, No. 5 C.D. 2016 (Memorandum Opinion and Order) (Pa. Cmwlth. Feb. 12, 2016).

On appeal to the Commonwealth Court, HIKO asserted that the PUC's imposition of a $1,836,125.00 civil penalty violates the Excessive Fines Clauses of the U.S.[10] and Pennsylvania Constitutions.  *HIKO*, 163 A.3d at 1088.  Specifically, HIKO noted that the nearly $2 million penalty imposed against it by the PUC is the highest civil penalty the PUC had imposed in its nearly 80-year history and is between 14 and 80 times higher than the penalties the PUC had approved in similar cases in the past.  Additionally, HIKO alleged that the PUC imposed this penalty without noting the financial constraints HIKO faced stemming from the polar vortex, and failed to consider the significantly smaller penalties imposed by the PUC in similar cases.  *Id.*

HIKO further argued that evaluating compliance with Article I, Section 13 of the Pennsylvania Constitution mirrors that of the Eighth Amendment of the Federal Constitution.  *Id.* (noting that a fine "violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense[.]") (quoting *United States v. Bajakajian*, 524 U.S. 321, 334 (1998)).  HIKO asserted that this Court evaluates proportionality as it has been articulated in *Solem v. Helm*, 463 U.S. 277 (1983), which mandates that the magnitude of the fine imposed be compared with treatment of other offenders in the same jurisdiction.  *HIKO*, 163 A.3d at 1089.

Here, HIKO argued the magnitude of the fine and gravity of the offense did not correspond with the treatment of other similarly situated entities.  Specifically, HIKO claimed that the instant penalty is greater than the respective fines imposed on other entities accused of similar or more egregious conduct.  In some other cases, HIKO pointed out, the fine was smaller than what was imposed here, yet the conduct of a larger

[10] U.S. CONST. amend. VIII.

EDC resulted in death and property destruction. *Id.* at 1090 (citing *Pa. Pub. Util. Comm'n, Bureau of Investigation & Enforcement v. UGI Utils., Inc., Gas Div.*, No. C-2012-2308997 (Pa. Pub. Util. Comm'n Feb. 19, 2013)). To justify the instant fine, HIKO asserted, the PUC unfairly weighed the intentional nature of the conduct and the magnitude of the violation, and disregarded relevant mitigating circumstances.

Further, HIKO argued that the polar vortex, which was beyond HIKO's control, was the cause of the increase in spot market prices for electricity. Additionally, HIKO pointed out that its CEO personally guaranteed a $20 million dollar loan in order to keep the company afloat, and that honoring its price guarantee would have rendered HIKO insolvent. *Id.* at 1092. HIKO asserted that the PUC minimized the importance of these unforeseeable conditions in its penalty analysis, and improperly found these and other circumstances to be no excuse for HIKO's conduct.

The Commonwealth Court concluded that HIKO's excessive fines argument under both the Pennsylvania and Federal Constitutions was waived because HIKO failed to raise the argument in its pre-hearing memorandum, its testimony, its brief after the ALJs' hearing, or its exceptions to the ALJs' initial decision. *Id.* at 1094. Moreover, the Commonwealth Court recognized its own limitations in reducing a fine imposed by the PUC, noting that it may do so only if there is a violation of constitutional rights, an error of law, or a finding that the PUC has not supported its factual findings with substantial evidence. *Id.* at 1095 (citing *Pub. Serv. Water Co. v. Pa. Pub. Util. Comm'n*, 645 A.2d 423 (Pa. Cmwlth. 1994)).

Notwithstanding a finding of waiver, the Commonwealth Court determined that HIKO's disproportionality argument was meritless. *Id.* The court pointed out that the cases HIKO relies on do not involve intentional conduct. *Id.* at 1095. Additionally, the Commonwealth Court reasoned that HIKO's comparison to penalties imposed against

other utilities is inappropriate for several reasons. First, the court noted that some of the other cases relied on settled prior to litigation, and the court recognized "the well-established legal principle often invoked by and before the PUC is that settlements do not set precedent." *Id.* Moreover, the court noted Section 69.1201(b) explicitly provides for stringent application of the penalty factors in litigated matters. 52 Pa. Code § 69.1201(b). Additionally, the court emphasized that whether the conduct at issue was intentional or negligent should be considered only after litigation, and if it is, the "[intentional] conduct may result in a higher penalty." 52 Pa. Code § 69.1201(c)(3).

Moreover, the court determined that the cases HIKO seeks comparison to were settled, rather than litigated, and factually distinguishable for several reasons. *HIKO*, 163 A.3d at 1096. Accordingly, those matters did not necessitate the imposition of a smaller fine on HIKO. Likewise, the court found HIKO's argument that the PUC failed to consider mitigating circumstances lacked merit as well. The Commonwealth Court reasoned, rather, that the ALJs and the PUC did, in fact, recognize that the polar vortex caused major price fluctuations in electricity service, and that the polar vortex was beyond HIKO's control. The PUC and ALJs, however, were not convinced that the polar vortex was a sufficient justification for HIKO's conduct. The court agreed, noting specifically that HIKO's introductory guarantee did not condition its variable rate program on any of the factors HIKO noted, thus it cannot retroactively rely on those circumstances to justify its actions and mitigate the imposed penalty. *Id.* at 1097.

Further, the court was unpersuaded by HIKO's arguments alleging that it lacked any history of non-compliance and that the PUC failed to account for HIKO's size in calculating the penalty. *Id.* at 1099. Regarding the non-compliance, the court noted that HIKO's EGS license was subject to reporting requirements regarding its sales and marketing practices in Pennsylvania due to numerous complaints against it in New York.

*Id.* The conditions applied from December 2012 to June 2014, a time-period that encompassed the violations in this case. Thus, on this basis alone, the court was not convinced that HIKO had a "history of compliance." *Id.* Further, the court recognized that, pursuant to the statute, "[t]he size of the utility <u>may</u> be considered to determine an appropriate penalty amount." *Id.* (quoting 52 Pa. Code § 69.1201(c)(8) (emphasis added)). Thus, the court noted that neither the Commission nor the ALJs were required to consider HIKO's size.

The court also rejected HIKO's contention that the PUC was effectively attempting to circumvent controlling authority which deprives it of the power to regulate EGS prices. Instead, the court noted that, per the Public Utility Code, EGSs must abide by PUC regulations, which, in some instances, relate to bill format, disclosure statements, and marketing and sales activities. *Id.* at 1100 (citing 66 Pa. C.S. § 2809; 52 Pa. Code § 54.4(a)). Thus, the Commonwealth Court concluded that the PUC was acting within its permitted scope of authority.

Lastly, the court rejected HIKO's contention that the PUC failed to properly take into account HIKO's efforts to mitigate financial harm to its customers. The court noted that the ALJs and the PUC did consider HIKO's mitigation efforts. Those efforts, however, did not persuade the PUC that HIKO's conduct warranted a lower penalty, noting that HIKO did not begin offering refunds until customers had complained or filed informal complaints with the BCS. *Id.* at 1101 (citing PUC Op. at 49).

Next, HIKO contended that the penalty impermissibly penalized it for exercising its right to litigate. *Id.* In support, HIKO alleged that the only possible explanation for refusing to treat settlements as precedential is because the PUC wanted to utilize the penalty as a punishment for HIKO choosing to litigate its case. HIKO further claimed that it had no real choice but to litigate this matter because I&E was initially seeking a $15 million civil

penalty along with license revocation, and was purportedly unwilling to settle on any terms absent a multi-million dollar penalty. In such a case, if pursuing litigation results in a disproportionate civil penalty, HIKO contends the PUC is effectively coercing parties into settling cases and abandoning their rights to litigate and appeal. HIKO argues that such a course of action is invalid, because it unnecessarily chills the exercise of a constitutional right. *Id.* at 1102 (citing *Commonwealth v. Brown*, 26 A.3d 485 (Pa. Super. 2011)).

The Commonwealth Court, however, again disagreed, noting that the ALJs and the PUC properly applied the ten factors for evaluating penalties listed in Section 69.1201. *See* 52 Pa. Code § 69.1201. Additionally, the court again recognized that HIKO was incorrect in asserting that the PUC failed to consider previously settled cases as precedential. Looking to past PUC decisions/opinions, the court concluded that the PUC has stated it "vigorously, and without equivocation, reject[s] considering a settlement as precedent, as to any subsequent issue, in any proceeding." *HIKO*, 163 A.3d at 1102 (quoting *Pa. Pub. Util. Comm'n v. The Bell Tel. Co. of Pa.*, No. R-811819, 1988 Pa. PUC LEXIS 572 at *19 (Nov. 10, 1988)). Moreover, as the court previously observed, the penalty factors are not applied in as strict a fashion in settled matters when compared to litigated matters, and some factors are only applicable in litigated cases. *Id.* at 1103 (citing 52 Pa. Code § 69.1201(b)). In this regard, settling parties are afforded more flexibility in "reaching amicable resolutions to complaints and other matters so long as the settlement is in the public interest." *Id.*

Further, the court determined that the settled cases on which HIKO relies are factually distinguishable and bear little weight for measuring the penalty imposed in this case. *Id.* Thus, in the court's view, the penalty imposed was not utilized as a penalty against HIKO for exercising its right to litigate, and the court asserted that HIKO's argument to the contrary was nothing more than a "bald assertion." *Id.*

As to its third argument, HIKO asserted that the PUC abused its discretion by sustaining the civil penalty in this case because, according to HIKO, the penalty lacked evidentiary support. HIKO noted that the PUC was free to disregard the ALJs' findings and recommended civil penalty, and in fact should have found that several of the factors justifying the penalty lacked support in the record. In fact, HIKO contended, the PUC acknowledges that the evidentiary support for some of these factors was wholly lacking. *Id.* at 1109.

HIKO further argued that the PUC utilized an improper method for computing the number of violations. HIKO posited that the PUC did not carry its burden of proof in establishing the precise number of violations. Thus, while HIKO acknowledged that it may not have carried its burden in correcting the computing mistakes, HIKO argued that I&E failed to meet its initial burden. In HIKO's view, because I&E failed to carry its burden in the first place, the burden to disprove the calculation never shifted to HIKO. *Id.* at 1109-10. Further, HIKO argued that several of the invoices relied upon by I&E involved very small overcharges, and should have been excluded from the computation as *de minimis* amounts. Additionally, HIKO pointed out that in other matters where the PUC imposed a penalty, it utilized a "per customer" method for computing violations of 52 Pa. Code § 54.4(a). *Id.* at 1110.

The Commonwealth Court, however, again rejected HIKO's arguments. Initially, the court recognized that HIKO failed to argue that several of the factors under 52 Pa. Code § 69.1201(c) lacked evidentiary support. Regarding the other factors which HIKO did raise, the court noted that the PUC properly considered the evidence, and did not reach unsupported conclusions. In any event, the court recognized that when considering all of the pertinent factors and the evidence of record before the ALJs and PUC, "the

record amply supports the PUC's decision regarding its imposition of the civil penalty." *HIKO*, 163 A.3d at 1113.

The court also rejected HIKO's argument that the PUC erred when it adopted a "per invoice" method for calculating the civil penalty in this case. The court noted that HIKO's CEO, Klein, testified that the data presented in I&E's exhibits relating to the number of violations were "true and correct business records representing billing data for HIKO customers of this price guarantee for January through April 2014 in each EDC service territory[.]" *Id.* at 1114 (citing PUC Op. at 32). Moreover, although HIKO presented the testimony of Dr. Cicchetti, that some of the billing entries "likely represented" contested billing that was later corrected, the testimony was rejected as conjecture. *Id.* Thus, the court determined that HIKO simply failed to counter the evidence which supported the "per invoice" computation of the penalty. Lastly, the court noted that although the PUC recognized some of the overcharges were minor, a *de minimis* exception did not exist in the regulations, and still warranted consideration when calculating the penalty.

**B. Dissenting Opinion**

President Judge Leavitt authored a dissent joined by Judge Cohn Jubelirer and Judge Covey. As to HIKO's first issue, the dissent argued that HIKO's constitutional argument was not waived because HIKO asserted that the penalty was "grossly disproportionate" in its Answer to I&E's Complaint. *HIKO*, 163 A.3d at 1122 (Leavitt, P.J., dissenting) (citing HIKO's Answer to I&E's Complaint, at New Matter ¶ 11). Moreover, HIKO again asserted the penalty was "grossly disproportionate" in its exception to the ALJs' penalty decision. *Id.* (citing HIKO Exception to ALJs' Initial Decision at 30-31). Relying on *Allegheny County v. Commonwealth*, 490 A.2d 402 (Pa. 1985), the dissent asserted that a party may identify additional legal authority on appeal to support a claim

it raised in the lower courts. On this basis, the dissent contended that the constitutional challenge was not waived. Rather, HIKO was not asserting a new claim or legal theory, it was merely offering additional legal authority to support its contention that the penalty was "grossly disproportionate." *HIKO*, 163 A.3d at 1122-23 (Leavitt, P.J., dissenting)

Finding that the constitutional argument was not waived, the dissent proceeded to analyze HIKO's constitutional claim. Initially, the dissent noted "that the excessive fines clause set forth in the Pennsylvania Constitution is coextensive with the Eighth Amendment to the U.S. Constitution." *Id.* at 1123 (citing *Commonwealth v. Eisenberg*, 98 A.3d 1268, 1281 (Pa. 2014)). The dissent then analyzed whether, in its view, the penalty was excessive when compared to the gravity of the offense.

Recognizing that this Court has pointed to *Solem* as the benchmark for analyzing an excessive fine claim, the dissent asserted that it must "compare the magnitude of the fine to the treatment of other offenders in the same jurisdiction, and to the treatment of the same offense in other jurisdictions." *HIKO*, 163 A.3d at 1123 (Leavitt, P.J., dissenting) (citing *Eisenberg*, 98 A.3d at 1282). The dissent also noted the importance of "intra-Pennsylvania" proportionality when analyzing an excessive fine claim. *Id.* (citing *Commonwealth v. Baker*, 78 A.3d 1044, 1055 (Pa. 2013)).

After outlining the above parameters governing an excessive fine analysis in Pennsylvania, the dissent concluded that the civil penalty imposed on HIKO could not be harmonized with the civil penalties imposed on similar entities for similar conduct. *Id.* at 1123. Notably, the dissent did not articulate that the similar cases it was referring to involved settled, rather than litigated, cases. Accordingly, the dissent contended that the penalty imposed in this instance violated the bar against excessive fines in both the Pennsylvania and United States Constitutions. *Id.*

The dissent also diverged from the majority's analysis in that it took issue with the PUC's methodology for computing the penalty against HIKO. The dissent recognized that in calculating the $1,836,125.00 penalty, the PUC multiplied the number of violations it found, 14,689, by $125.00, which was comparable to the average overcharge per customer of $124.00. The dissent, however, reasoned that because the average overcharge amount was $124.00 *per customer*, that figure should have been multiplied by the total number of affected customers, in this case, 5,708. Such a calculation would result in a penalty amount of $713,500.00, which the dissent opined was sufficient and consistent with the PUC's history. Moreover, the dissent concluded that there was a dearth of evidence supporting the finding that HIKO had committed 14,689 violations. Contrary to the majority's reasoning, the dissent concluded that I&E failed to meet its burden to prove 14,689 violations. Accordingly, the dissent continued, the burden of *disproving* those violations never shifted to HIKO. *Id.* at 1124-25.

## III.    Grant of Allocatur and Standard of Review

On December 13, 2017, this Court granted allowance of appeal to consider the following issues:

> 1. Whether the $1,836,125.00 penalty was so grossly disproportionate to the penalties the Commission has approved for similar or more egregious conduct as to violate the Excessive Fines Clause of the Pennsylvania and U.S. Constitutions.
>
> 2. Whether the $1,836,125.00 penalty impermissibly punished HIKO for litigating the complaint for a civil penalty instead of settling it.
>
> 3. Whether the Commission abused its discretion in imposing an unprecedented civil penalty, which was not supported by substantial evidence.

*HIKO Energy, LLC v. Pa. Pub. Util. Comm'n*, 176 A.3d 235 (Pa. 2017).

In appeals from Pennsylvania Utility Commission matters, an appellate court is limited to determining "whether constitutional rights have been violated, an error of law has been committed, or the Commission's findings and conclusions are, or are not, supported by substantial evidence." *Barasch v. Pa. Pub. Util. Comm'n*, 493 A.2d 653, 655 (Pa. 1985); *see also* 2 Pa.C.S. § 704. Conformity with those principles is reviewed under an abuse of discretion standard. *Fraternal Order of Police v. Pa. Labor Relations Bd.*, 735 A.2d 96, 99 (Pa. 1999) (the "essential import [of this standard] is to establish a limited appellate review of agency conclusions to ensure that they are adequately supported by competent factual findings, are free from arbitrary or capricious decision making, and, to the extent relevant, represent a proper exercise of the agency's discretion.").

## IV. Whether the Fine Violates the Excessive Fines Clause

### A. The Parties' Arguments

In its first argument, HIKO asserts an as-applied constitutional challenge to the penalty the PUC imposed. HIKO acknowledges it is not asserting that the Commission's penalty powers are unconstitutional, or that its penalty policy is facially unconstitutional. Rather, HIKO argues that the civil penalty in this case violates the Excessive Fines Clauses of the Federal and Pennsylvania Constitutions because it is grossly disproportionate to past civil penalties the PUC has issued. HIKO's Brief at 25.

In evaluating the constitutionality of a fine, HIKO notes courts should conduct a proportionality test by comparing the magnitude of the fine to the gravity of the offense and to the treatment of offenders in both the same jurisdiction and other jurisdictions. HIKO's Brief at 26 (citing *Solem, supra*) HIKO also correctly points out that this Court, when comparing proportionality, favors an intra-Pennsylvania analysis, *Eisenberg*, 98 A.3d at 1283, and alleges we recently indicated courts should consider the impact of the

fine on the violator. *Id.* (citing *Shoul v. Commonwealth, Dep't of Transp.*, 173 A.3d 669, 686 (Pa. 2017)).

HIKO recognizes that the PUC's rationale for imposing the fine in this case rested upon the intentional conduct of HIKO's CEO coupled with the magnitude of the violation. HIKO's Brief at 28. However, HIKO alleges that both of these factors are present in other cases where a much smaller civil penalty was imposed.

The first proceeding HIKO utilizes for comparison is an action against Energy Services Providers, Inc. d/b/a Pennsylvania Gas & Electric (PaG&E). *Commonwealth v. PaG&E*, No. C-2014-2427656, Tentative Form Opinion & Order, at 4-7 (Pa. Pub. Util. Comm'n Feb 11, 2016). In that case, PaG&E was alleged to have violated Section 54.4(a) during the 2014 polar vortex by charging prices that did not conform to the Company's disclosure statement. HIKO's Brief at 29-30 (citing *Commonwealth v. PaG&E*, Docket No. C-2014-2427656, Joint Complaint filed June 20, 2014 at ¶¶ 20, 64). Notwithstanding this violation, HIKO notes the PUC approved a civil penalty of $25,000.00 in the PaG&E settlement, which was 1.4% of the penalty imposed on HIKO. *Id.* at 30. Further, HIKO contends that this settlement was permitted even though PaG&E had received more customer complaints and had a history of violations including "slamming"[11] customers. *Id.* at 29-30.

HIKO further relies on settlements in proceedings against IDT Energy, Inc. (IDT) and Respond Power, LLC (Respond). Both of those proceedings, HIKO notes, concerned violations stemming from increases of variable rate prices during the polar vortex. *Id.* at 30. Irrespective of the factual similarities, however, HIKO notes that both entities received

---

[11] "Slamming" refers to the practice of changing a customer's supply service without authorization. *See Pa. Pub. Util. Comm'n, Bureau of Investigation and Enforcement v. ResCom Energy LLC*, No. M-2013-2320112, 2014 WL 2876696 (Pa. Pub. Util. Comm'n June 20, 2014).

civil penalties dramatically lower than the penalty imposed on HIKO; IDT received a $25,000.00 civil penalty, and Respond received a $125,000.00 civil penalty. *See Commonwealth v. IDT Energy, Inc.*, No. C-2014-2427657, Tentative Opinion & Order (Pa. Pub. Util. Comm'n June 30, 2016); *Commonwealth v. Respond Power LLC*, No. C-2014-2427659, Initial Decision (ALJs May 17, 2016).

Next, HIKO disputes the PUC's contention that settled cases carry no precedential value. Instead, HIKO submits the precedential nature of a case is not relevant to a proportionality analysis because the Section 69.1201(c) Penalty Policy does not exempt comparison to other settlements. 52 Pa. Code § 69.1201(c)(9). HIKO asserts that dismissing those cases as non-precedential undercuts this Court's directive to conduct an "intra-Pennsylvania" proportionality analysis. HIKO's Brief at 33 (citing *Eisenberg*, 98 A.3d at 1282-83). Moreover, HIKO argues that the PUC's disregard of its prior settled cases is particularly troubling because the ALJs could not locate any litigated cases to compare this case to in order to effectuate a proportionality analysis. Accordingly, comparing the penalty imposed in those three cases with the penalty in this case, HIKO contends the different penalty amounts cannot be reconciled, particularly given the fact that the comparable cases concern similar violations stemming from the same polar vortex event.

Further, HIKO argues that its violations in this case were not as serious as two other cases, but HIKO still received a far greater penalty. First, HIKO points to a "slamming" case where Public Power, LLC was alleged to have fraudulently enrolled 2,937 customers in its plan and a settlement was approved which contained a $64,450.00 penalty. *See Pa. Pub. Util. Comm'n, Bureau of Investigation and Enforcement v. Public Power, LLC*, Docket No. M-2012-2257858, Opinion and Order at 4, 8. (Pa. Pub. Util. Comm'n Dec. 19, 2013). In another case, UGI Utilities' alleged safety violations caused

a pipeline explosion killing five people and destroying eight homes, and the PUC approved a settlement containing a $500,000 civil penalty. *See Pa. Pub. Util. Comm'n, Bureau of Investigation & Enforcement v. UGI Utils., Inc. - Gas Div.*, Docket No. C-2012-2308997, Opinion and Order, at 30, 36 (Pa. Pub. Util. Comm'n Feb. 19, 2013).

Additionally, HIKO asserts that the PUC failed to take into account HIKO's smaller size when compared with other companies against which the PUC has assessed smaller civil penalties. In one example discussed above, HIKO points out the PUC's approval of a $500,000.00 civil penalty against UGI Utilities for pipeline safety violations. *Id.* at 30, 36. HIKO further points out, however, that the PUC later decided that penalty was inadequate to deter future violations by UGI, and approved an additional penalty of $1,000,000.00. *Pa. Pub. Util. Comm'n, Bureau of Investigation & Enforcement v. UGI Penn Nat. Gas, Inc.*, No. M-2013-2338981, Opinion and Order, at 15, 18, 20 (Pa. Pub. Util. Comm'n Sept. 26, 2013). In another instance, the PUC settled with Uber for a $3.5 million civil penalty stemming from over 100,000 regulatory violations. *See Uber Techs. v. Pa. Pub. Util. Comm'n*, 1617 C.D. 2016, Settlement Agreement, at 4 (Pa. Cmwlth. 2017). HIKO submits that given its much smaller size when compared to UGI or Uber, HIKO's history of compliance, the absence of any threat to public safety, and that the cause of the violations (the polar vortex) was beyond HIKO's control, the PUC had no basis to deter HIKO by imposing a penalty higher than the UGI penalty and more than half as much as the Uber Penalty. HIKO's Brief at 40.

Lastly, HIKO contends the PUC ignored several mitigating factors, specifically: (1) unanticipated severe weather and accompanying market disruption; (2) HIKO's restitution payments to overcharged customers; (3) HIKO's contributions to the local hardship funds to provide energy for low-income consumers; (4) HIKO's suspended marketing of variable rate products; and (5) HIKO's change of marketing and energy purchasing practices.

HIKO's Brief 41-44. HIKO argues that the PUC's failure to credit HIKO with the same mitigation it accepted in other cases is evidence of the grossly disproportionate nature of the penalty.

In contrast, the PUC argues that the Commonwealth Court correctly concluded HIKO waived its constitutional challenges to the civil penalty. Specifically, the PUC contends HIKO did not preserve the issues before the administrative agency because it failed to raise the specific constitutional provisions it claimed the penalty violated. PUC's Brief at 11-12. In this regard, the PUC echoes the reasoning of the Commonwealth Court majority, and contends that HIKO's mere allegation that the penalty was grossly disproportionate did not alone preserve the constitutional argument because a party must state "in somewhat express terms, the specific constitutional grounds upon which the challenger is basing its attack." *Id.* (quoting *In re F.C. III*, 2 A.3d 1201, 1212 (Pa. 2010)).

Assuming the constitutional challenge was properly preserved, the PUC submits the penalty was not excessive given the offense and the magnitude of HIKO's deliberate decision to overcharge its customers. The PUC contends the dispositive factor is whether the penalty was irrational or unreasonable, which it maintains this penalty was not because HIKO's misconduct was unprecedented and egregious. *Id.* at 15 (citing *Commonwealth v. Gipple*, 613 A.2d 600, 602 (Pa. Super. 1992)). Further, the PUC argues that every HIKO invoice that represented an intentional overcharge was a separate and distinct violation of 52 Pa. Code § 54.4(a); thus, as the lower tribunals found, HIKO committed 14,689 violations. The PUC further points out that the maximum penalty for each violation is $1,000.00 pursuant to 66 Pa.C.S. § 3301. In this case, however, the PUC posits that it only imposed a civil penalty of $125.00 per violation, which is well below the statutory maximum. Moreover, the PUC asserts the penalty is tailored to the offense because the average overbill amount was $124.00. PUC's Brief at 16.

Lastly, the PUC claims that the other cases HIKO relies on for purposes of comparison are distinguishable because none involved intentional overcharging of several thousand customers at the direction of the CEO and upper management. Thus, because the conduct here was particularly egregious, the PUC asserts that the penalty should be affirmed as constitutional. *Id.* at 20.

In its reply brief, HIKO asserts that the PUC's waiver argument fails for two distinct reasons. First, HIKO points out that the question of waiver is not present in the questions for which we granted allocatur. HIKO's Reply Brief at 4-5 (citing *Commonwealth v. Lynn*, 114 A.3d 796, 823 (Pa. 2015)). Second, HIKO contends that even if the question of waiver was properly before this Court, it would fail, because HIKO claims it repeatedly raised the issue of gross disproportionality of the civil penalty before the Commission. *Id.* at 5. Thus, as the dissent noted, HIKO alleges that it was not presenting a new argument, but rather was "offering authority to support its prior argument." HIKO's Reply Brief at 6 n.4 (citing *Shenango Inc. v. Dep't of Envtl. Prot.*, 934 A.2d 135, 142 n.16 (Pa. Cmwlth. 2007)).

HIKO also highlights that the PUC's penalty policy requires it to consider "[p]ast Commission decisions in similar situations." 52 Pa. Code § 69.1201(c)(9). Accordingly, HIKO asserts that the PUC cannot disregard settled cases when they are factually similar because comparison is required to show that the penalty in this case is grossly disproportionate. HIKO reiterates that other cases - specifically *PaG&E*, *IDT*, and *Respond*, discussed *supra* - concern similar factual scenarios relating to the polar vortex of 2014. HIKO posits that the only distinguishing factors between the present case and those cases is the size of the penalty. HIKO's Reply Brief at 10-12.

Additionally, HIKO notes that even though the penalty statute permitted the civil penalty in this case, it can still be grossly disproportionate in application. Similarly, the

fact that I&E sought a higher penalty does not make the PUC's imposition of a lesser amount reasonable if it is grossly disproportionate to other penalties in similar cases.

## B. Legal Analysis

As a preliminary matter, we must determine whether HIKO properly preserved its constitutional claim. Generally, a party waives appellate review of a claim when it fails to raise the issue before an administrative tribunal rendering a final decision. *SugarHouse HSP Gaming, L.P. v. Pa. Gaming Control Bd.*, 162 A.3d 353, 365 (Pa. 2017) (quoting *Wing v. Unemployment Comp. Bd. of Review*, 436 A.2d 179, 181 (Pa. 1981)). Policy considerations regarding the efficacy of administrative tribunals mandate this conclusion:

> [T]he administrative law tribunal must be given the opportunity to correct its errors as early as possible; diligent preparation and effective advocacy before the tribunal must be encouraged by requiring the parties to develop complete records and advance all legal theories; and the finality of the lower tribunals' determinations must not be eroded by treating each determination as part of a sequence of piecemeal adjudications.

*Wing*, 436 A.2d at 181. Issue preservation requirements promote "the orderly and efficient use of our judicial resources." *In re F.C. III*, 2 A.3d 1201, 1212 (Pa. 2010). Indeed, when an appellate court hears arguments on an issue not properly raised below, it effectively equates the lower tribunal's proceedings to "merely a dress rehearsal." *Dilliplaine v. Lehigh Valley Trust Co.*, 322 A.2d 114, 116 (Pa. 1974).

Although the lower tribunal in this case is an administrative agency, waiver principles still apply. We have expressly held that as-applied constitutional challenges must be raised before administrative agencies. *Lehman v. Pennsylvania State Police*, 839 A.2d 265, 276 (Pa. 2003) ("[C]laims challenging a statute's application to the facts of a particular case must be raised before the agency or are waived.") Several cogent reasons distinct to administrative agencies support this conclusion:

> First, the agency is given an opportunity to interpret the statute it is charged with administering to avoid an unconstitutional application. Second, agencies currently decide challenges to the constitutionality of regulations; administrative competency is not an issue. Third, agencies are better situated than the courts to develop agency-specific issues, and to find facts. Fourth, refusing to consider constitutional challenges to a statutes application allows litigants to circumvent the exhaustion of administrative remedies doctrine before seeking judicial review.

*Id.*; *see also Lyft, Inc. v. Pa. Pub. Util. Comm'n*, 145 A.3d 1235, 1245 (Pa. Cmwlth. 2016) (finding waiver for failure to raise issues before the agency); *Wheeling & Lake Erie Ry. Co. v. Pa. Pub. Util. Comm'n*, 778 A.2d 785, 795 (Pa. Cmwlth. 2001) ("It is well established that where, as here, the appellant failed to raise the issue before the agency, the issue has been waived and cannot be considered on appeal.")

Notwithstanding our waiver jurisprudence, we have recognized the delicate, yet distinct line between failing to raise a claim and adducing additional authority for an appellate court. *See Allegheny Cnty. v. Commonwealth*, 490 A.2d 402, 413 n.9 (Pa. 1985) (recognizing "the County has merely identified additional legal authority in support of its claims; the county's basic theory is the same as that set forth in its amended complaint. While that complaint left something to be desired as regards citation to specific statutory provisions, this belated clarification of the County's claims should not inure to its prejudice."). In evaluating this distinction, the critical inquiry is whether a party is raising a wholly new legal theory, or is merely strengthening its previously articulated argument with additional legal authority. *Id.*; *see also Shenango Inc. v. Dep't of Envtl. Prot.*, 934 A.2d 135, 142 n.16 (Pa. Cmwlth. 2007) (reasoning that a party's failure to expressly address a regulation did not result in waiver because the party did argue the underlying legal theory in the lower court without citation to that regulation).

Here, we find that HIKO failed to preserve a constitutional challenge to the fines imposed pursuant to Section 54.4(a) because it did not articulate its constitutional theory

until its application for a stay of the Commission's decision. *See* Emergency Petition for Supersedeas, 12/18/15, at 6. While we acknowledge HIKO asserted in its lower pleadings that the penalty was, in its view, disproportionate to penalties in other cases, it did so only in relation to the application of the factors enumerated in Section 69.1201(c). The argument that the fine was grossly disproportionate to other PUC fines imposed does not preserve a claim that Section 54.4(a) as applied to HIKO is unconstitutional. *See Lehman*, 839 A.2d at 276. When a party is alleging a statute is unconstitutional, whether as applied or on its face, "it is incumbent . . . to state, at least in somewhat express terms, the specific constitutional grounds upon which the challenger is basing its attack on the legislation." *In re F.C. III*, 2 A.3d at 1212.

While courts have found issues preserved based on a party's failure to cite to specific authority, *Allegheny County*, *Shenango*, *supra*, our precedent does not grant the same leniency to constitutional challenges. *Lehman, F.C. III*, *supra*; *see also Eisenberg*, 98 A.3d at 1275. In *Eisenberg*, we noted that although the Appellant's constitutional challenge was poorly articulated it was preserved, because:

> Counsel specifically referenced the Cruel Punishments Clause of Article I, Section 13 of the Pennsylvania Constitution (as well as the Cruel and Unusual Punishment Clause of the U.S. Constitution, found in the Eighth Amendment). . . . *Also relevant, for issue preservation purposes, is that the trial court plainly understood the gravamen of the claim* . . . . In addition, the court conveyed at the outset its remarks, albeit in oblique terms, that the constitutional issue would ultimately not be resolved in that trial courtroom.

*Eisenberg*, 98 A.3d at 1275 (emphasis added).

A critical difference in *Eisenberg* as compared to the present matter is the lower tribunal's comprehension of the claim. *Id.* HIKO asserts that it raised the excessive fines constitutional theory in its Answer to I&E's Complaint, as well is in its Exceptions to the

ALJs' Penalty Decision. In its Answer to I&E's Complaint, HIKO asserted that the "requested relief is grossly disproportionate to said violation(s)." *See* HIKO's Answer to I&E's Complaint, 7/31/14, New Matter at ¶ 11. In the Exceptions filed to the ALJs' Initial Decision, HIKO generally argues that the ALJs failed to properly apply the penalty factors and consider mitigating circumstances, which resulted in a disproportionate penalty. Exceptions of HIKO Energy, LLC to Initial Decision, 9/10/15, at 7, 29-32. Critically, however, the PUC did not recognize these references as HIKO raising a constitutional argument, because the Commission did not analyze or mention whether the penalty complied with the Excessive Fines Clause. Op. at 23 (summarizing HIKO's arguments). Accordingly, because HIKO failed to raise its constitutional challenge before the PUC, we hold that the argument is waived.

**V.     Whether the Fine Penalizes HIKO for Exercising its Right to Litigate**

**A. The Parties' Arguments**

In the second issue, HIKO contends the PUC impermissibly penalized it for exercising its right to litigate this case. Specifically, HIKO notes that Article 1, Section 11 of the Pennsylvania Constitution protects an individual's right to seek a remedy in court for an injury done to "lands, goods, person or reputation" which includes the right to "justice administered without sale, denial or delay. . . ." PA. CONST. art. 1, § 11. Further, HIKO asserts Article 1, Section 11 works in conjunction with Article 5, Section 9, which protects the right of appeal from an agency determination to a court of record. PA. CONST. art. 5, § 9 (". . . there shall [] be a right of appeal from a court of record or from an administrative agency to a court of record or to an appellate court . . . ."). HIKO argues that this Court should recognize that coercion to settle, upon the threat of excessive penalties, violates these due process provisions. HIKO's Brief at 45-46. Moreover, HIKO

argues that the PUC's willingness and ability to ignore past settlements concerning factually similar proceedings pressures prospective litigants into settling. *Id.* at 46.

Further, HIKO points out that I&E initially sought a civil penalty of approximately $15 million in addition to potential license revocation, and noted that I&E refused to join its settlement with OAG and OCA. Instead, HIKO argues, I&E continued to push for "extraordinary penalties, restitution, and revocation of HIKO's license, despite its decision not to object to the OAG/OCA settlement." HIKO's Brief at 47. Based on this, HIKO submits it had no choice but to litigate, and the resulting penalty was imposed as a punishment for that choice. Accordingly, HIKO submits the PUC impermissibly chilled the exercise of HIKO's constitutionally protected right to litigate the case through the courts. HIKO's Brief at 48 (citing *Commonwealth v. Brown*, 26 A.3d 485, 505 (Pa. Super. 2011)).

The PUC contends that there is no evidence to support HIKO's argument that it penalized HIKO for litigating the case. The PUC points out that the Commonwealth Court described this argument as a "bald assertion" and found "nothing in the record substantiates [this argument]." PUC's Brief at 21 (quoting *HIKO*, 163 A.3d at 1103). Moreover, the PUC also asserts that irrespective of the merits of HIKO's argument on this point, the underlying settlement negotiations are inadmissible pursuant to Pa.R.E. 408, 1 Pa. Code § 35.115, and 52 Pa. Code § 5.231(d).[12]

_____

[12] Pennsylvania Rule of Evidence 408 precludes evidence of:

> (1) furnishing, promising, or offering--or accepting, promising to accept, or offering to accept--a valuable consideration in compromising or attempting to compromise the claim; and

> (2) conduct or a statement made during compromise negotiations about the claim.

Further, 1 Pa. Code § 35.115, a subset of the General Rules of Administrative Practice and Procedure, states:

Next, the PUC argues it was not required to consider penalties in settled cases when calculating HIKO's civil penalty. The PUC submits that its policy statement distinguishes the considerations in litigated cases by providing "[m]any of the same factors and standards may be considered in the evaluation of both litigated and settled cases. When applied in settled cases, these factors and standards will not be applied in as strict a fashion as in a litigated proceeding." 52 Pa. Code § 69.1201(b). Significantly, in this case, the PUC points out that the factor of intentional conduct is relevant only in litigated cases and generally mandates a higher penalty. 52 Pa. Code § 69.1201(c)(3).

The PUC emphasizes that evidentiary records associated with settlements generally contain no admission of wrongdoing. PUC's Brief at 26. Further, even if the PUC could consider past settlements, it submits that comparison would not be helpful because HIKO's conduct here is incomparable to other matters.

---

Nothing contained in these rules shall be construed as precluding a participant in a proceeding from submitting at any time offers of settlement or proposals of adjustment to all parties and to the agency, or to staff counsel for transmittal to the agency, or from requesting conferences for that purpose. Unaccepted proposals of settlement or of adjustment or as to procedure to be followed and proposed stipulations not agreed to shall be privileged and are not admissible in evidence against a counsel or person claiming such privilege.

Moreover, the regulations governing PUC hearings state, in relevant part:

Offers of settlement, or adjustment, or of procedure to be followed, and proposed stipulations not agreed to by every party, including proposals intended to resolve discovery disputes, will not be admissible in evidence against a counsel or party claiming the privilege.

52 Pa. Code § 5.231(d). The PUC argues these rules and regulations, taken together, bar any evidence relating to the settlement negotiations between it and HIKO. Specifically, the PUC contends that HIKO is precluded from relying on the substance of the settlement negotiations in this case. PUC's Brief at 22-23.

Finally, the PUC stresses that by litigating this case, HIKO assumed the uncertainty inherent in litigation. The PUC compares HIKO's decisions to litigate with a criminal defendant rejecting a plea bargain and opting instead for a trial. PUC's Brief at 28. While in that scenario the defendant may be acquitted, HIKO emphasizes that the defendant may also face a more severe penalty than what was offered in the plea deal. Similarly, the PUC asserts that in this case, HIKO bore the risk associated with litigation. *Id.*

In its reply brief, HIKO posits that notwithstanding the risk of litigation, the underlying premises governing a penalty should be predictable. HIKO's Reply Brief at 19. HIKO further reiterates that it did not have an option to settle with I&E, because I&E was initially seeking a $15 million penalty demand, and HIKO claims I&E refused to modify its penalty demand despite the OAG/OCA Settlement. HIKO's Reply Brief at 19-20.

## B. Legal Analysis

Like the Commonwealth Court, we reject HIKO's contention that the Commission imposed the civil penalty in this case based on HIKO's choice to litigate the matter. *HIKO*, 163 A.3d at 1102. Although framed differently, HIKO is again attempting to compare the penalty imposed here with the penalties in factually incomparable *settled* cases. Nonetheless, the conclusions remain the same: the PUC "vigorously, and without equivocation, reject[s] considering a settlement as precedent, as to *any* subsequent issue, in *any* proceeding." *The Bell Tel. Co. of Pa.*, 1988 Pa. PUC LEXIS 572 at *19 (emphasis in original). This sentiment is particularly true when attempting to compare civil penalties or fines in settled cases with those in litigated cases because, as the PUC points out, settled cases do not contain a full evidentiary record or a finding or admission of wrongdoing.

Moreover, as has been made clear throughout this proceeding, and was again recognized above, the penalty factors utilized to compute the penalty are applied with more leniency in settled cases. 52 Pa. Code. § 69.1201(b). Indeed, the third penalty factor concerning whether the conduct at issue was intentional or negligent is *only* applicable in litigated cases, 52 Pa. Code § 69.1201(c)(3), and HIKO's conduct was a major consideration in computing the penalty in this case. *HIKO*, 163 A.3d at 1103.

Aside from reanalyzing the comparative or proportionality arguments discussed above, we see no factual or legal basis for HIKO to assert it was penalized for litigating this matter.[13] Litigation brings with it inherent risks and uncertainties not associated with settlement. *See, e.g., Baker v. AC&S, Inc.*, 755 A.2d 664, 670 (Pa. 2000) (recognizing the choice of certain parties to "encounter the uncertainties of litigation[]"). I&E initially sought a statutory maximum penalty of approximately $15 million, and the penalty which was ultimately imposed was roughly 13% of that initial demand. *HIKO*, 163 A.3d at 1103. Although HIKO may have been displeased with initial settlement negotiations, the record is devoid of evidence that the PUC compelled it to litigate.

## VI. Whether Substantial Evidence Supports the Fine

### A. The Parties' Arguments

Lastly, HIKO argues that the PUC abused its discretion because the civil penalty in this case was not supported by substantial evidence. First, HIKO contends that the PUC erred in computing the civil penalty in this case by utilizing a "per invoice"

---

[13] Inasmuch as HIKO frames this argument as an infringement on a constitutional right protected by Article 1, Section 11 and Article 5, Section 9 of the Pennsylvania Constitution, its argument is underdeveloped and lacks evidentiary support in the record. In any event, HIKO is merely reframing its first argument and ultimately seeks to compare the penalty in this case with the penalty in other, settled cases. For the reasons set forth above, such an analysis does not warrant relief notwithstanding HIKO's attempted invocation of our state charter.

methodology, which led to finding 14,689 separate violations. HIKO's Brief at 49. HIKO alleges that this computation was incorrect because its failure to honor the price guarantee was the result of one single business decision, not 14,689 decisions. *Id.* Additionally, HIKO looks to the language utilized in Section 54.4(a), which provides that "EGS prices *billed* must reflect the marketed prices and the agreed upon prices in the disclosure statement." *Id.* at 50 (quoting 52 Pa. Code § 54.4(a) (emphasis added)). In HIKO's view, this language requires only that the actual prices billed reflect the agreed upon prices; it does not mandate that each invoice be accurate. *Id.* at 51. Critically, HIKO argues, the amount on the invoice and the amount actually billed may be different. HIKO posits that these discrepancies are evidence that I&E failed to carry its burden in proving the specific number of violations. *Id.* at 52 (citing *HIKO*, 163 A.3d at 1125 (Leavitt, P.J., dissenting)). Thus, although the Commission determined HIKO failed to rebut I&E's proffered evidence of violations, HIKO alleges that the burden to disprove the violations never should have shifted to it due to I&E's failure to meet its initial burden. HIKO's Brief at 52-53.

Second, HIKO argues that the PUC ignored its own precedent where it utilized a "per customer" calculation rather than a "per invoice" one. Specifically, HIKO points us to *Herp v. Respond Power LLC*, where a former customer alleged that Respond had increased its variable rate price over the PTC during the polar vortex. *Herp v. Respond Power LLC*, No. C-2014-2413756, Opinion and Order (Pa. Pub. Util. Comm'n Jan. 28, 2016). After a hearing, the ALJ concluded that Respond had violated 10 distinct Commission regulations. *Id.* One of those regulations was Section 54.4(a), which the ALJs concluded Respond had violated based on its failure to bill at its marketed price during the winter months of 2014. *Id.* The Commission upheld the maximum penalty of $1,000.00 per violation but found only four regulatory violations. *Id.* The PUC imposed

a $4,000.00 penalty, calculated at $1,000.00 per violation. *Id.* From this, HIKO asserts that Respond was fined $1,000.00 for violating Section 54.4(a) even though Respond's monthly invoices exceeded the marketed price in three separate months. *Id.* Thus, HIKO contends that the PUC applied a per customer computation in past cases, and it should do the same here. HIKO's Brief at 54. If a "per customer" methodology were utilized, HIKO notes that it would still be subject to a substantial fine of $713,500.00 based on a $125.00 per violation calculation. HIKO's Brief at 55.

Finally, HIKO contends that the PUC erred when it did not reduce the civil penalty notwithstanding its acknowledgment that several of the ALJs' conclusions lacked evidentiary support. Specifically, HIKO emphasizes the PUC discounted several of the ALJs' conclusions, including the financial hardship suffered by HIKO's customers and HIKO's alleged failure to comply with the surety requirements. Additionally, HIKO notes that no finding was made as to its size. HIKO submits it logically follows that the penalty against it should be reduced because these conclusions and the associated penalty factors were weighed against it when originally calculating the penalty. HIKO's Brief at 57-58.

The PUC counters HIKO's argument, and claims that substantial evidence supported the civil penalty imposed against HIKO. First, the PUC contends that its "per invoice" methodology is consistent with 52 Pa. Code § 54.4(a), because each time HIKO issued an invoice that did not match its guaranteed price, it violated Section 54.4(a). PUC's Brief at 29. The PUC argues that Section 54.4(a) merely requires proof of disparate pricing between the prices billed and the process marketed. *Id.* (citing 52 Pa. Code § 54.4(a)). Thus, the PUC continues, because the invoices reflect disparate amounts from what was guaranteed in the disclosure statement, HIKO violated Section 54.4(a) with each invoice. *Id.* at 29-30.

The PUC further contends that HIKO's purported "per customer" methodology is not viable because it ignores the fact that HIKO overbilled some customers multiple times. Similarly, although HIKO characterizes the violation here as resulting from one business decision, the PUC posits that each overcharge flowing from that decision amounts to a discrete violation, regardless of the number of violations which ultimately occur. *Id.* at 32 (citing *Newcomer Trucking, Inc. v. Pa. Pub. Util. Comm'n*, 531 A.2d 85 (Pa. Cmwlth 1987) (noting that the PUC may "impose a fine of up to $1,000 for each and every discrete violation of the Code or PUC regulation, regardless of the number of violations that occur.")) Moreover, the PUC opines that HIKO's purported reduction of its conduct down to one business decision cynically ignores the consequences of the decision, which resulted in 14,689 overbilled invoices. *Id.* at 31.

Next, the PUC argues that it relied on HIKO's business records to establish the violations. Indeed, the PUC submits that each invoice reflecting a price higher than what was guaranteed was construed as a violation. The PUC emphasizes that HIKO's CEO authenticated and explained these records. As a result, the PUC asserts it was HIKO's burden to rebut the evidence, which it failed to do. *Id.* at 33-34. Instead, the PUC argues, HIKO's expert, Dr. Cicchetti, provided mere conjecture, which the ALJs found unpersuasive to surmount the evidence set forth by I&E. *Id.* at 35-39. On appeal, the PUC notes that the Commission agreed with the ALJs, and found that HIKO failed to present clear evidence of error that the billing data--which HIKO provided-- was not true and correct. *Id.*

The PUC further posits that HIKO's reliance on *Herp* is misplaced for several reasons. First, the PUC notes that, notwithstanding HIKO's mischaracterization, the Commission in *Herp* utilized a "per violation" calculation for determining the relevant fine. *Id.* at 41. Moreover, unlike this case, the PUC submits that *Herp* concerned one

customer. Additionally, the PUC argues that HIKO's violations resulted from the intentional conduct of management, and thus, the factual differences between this case and *Herp* render comparison unpersuasive. Further, irrespective of *Herp,* even if the Commission utilized a per customer analysis in this case, the PUC asserts it could still impose a fine of $5,708,000.00, or a $1,000.00 fine for each of the 5,708 affected customers. *Id.* at 42 (citing 66 Pa. C.S. § 3301).

Lastly, the PUC contends that despite some discrepancies in the record, it properly found that HIKO engaged in intentional, fraudulent conduct in a highly competitive market, which is sufficient to support the penalty it imposed. *Id.* at 43-44. Moreover, notwithstanding HIKO's argument regarding the application and supportive evidence of specific penalty factors, the Commission concluded that "the remaining factors as a whole support[] the recommended penalty." PUC's Brief at 47 (quoting PUC Op. at 52). The PUC concludes its argument by again emphasizing the intentional conduct undertaken by HIKO in this case, and noting that HIKO utilized its customers as financial guarantors of its business. HIKO's Brief at 48.

In its reply brief, HIKO maintains that the Commission's decision was not supported by substantial evidence. HIKO's Reply Brief at 21. HIKO stresses the PUC's admission that the record contained discrepancies, yet notes that the PUC refused to adjust the corresponding penalty. *Id.* HIKO further reiterates the arguments which it raised in its main brief, and emphasizes that several factors supporting the penalty lacked evidence. HIKO's Reply Brief at 25-26.

**B. Legal Analysis**

After careful consideration, we find substantial evidence supports the civil penalty imposed in this case. Section 54.4(a) states "[EGS] prices billed must reflect the marketed prices and the agreed upon prices in the disclosure statement." 52 Pa. Code

§ 54.4(a). Through testimony, the parties confirmed that the spreadsheets I&E relied on to determine the number of violations of Section 54.4(a) were produced by HIKO. N.T., 4/20/15, at 148 (Testimony of Harvey Klein); Pre-served Direct Testimony of Daniel Mumford, 12/23/14, at 19. Klein further confirmed the composition of the spreadsheets, and agreed that lines which represented an overcharge were highlighted. N.T., 4/20/15, at 153 (Testimony of Harvey Klein). Through these exhibits and the corresponding testimony, it is clear that I&E carried its burden of proving the existence of 14,689 violations.

HIKO attempted to rebut this testimony through its expert, Dr. Cicchetti, but the ALJs and the Commission were unpersuaded and rejected the testimony, finding it contained conjecture. PUC Op. at 30-33. As the Commonwealth Court succinctly stated "I&E presented evidence of HIKO's billing invoices utilizing data that HIKO provided, and HIKO did not present any clear evidence to refute that evidence." *HIKO*, 163 A.3d at 1114. It is not the proper function of this Court to reweigh the evidence and reassign credibility to findings made by the lower tribunals. *Barasch*, 493 A.2d at 655 (noting an appellate court's standard of review in appeals from the Pennsylvania Utility Commission). Accordingly, we see no reason to disturb this determination on appeal.

Similarly, we find no abuse of discretion in the Commission's conclusion that, despite some discrepancies, the penalty factors still weighed in favor of the civil penalty it imposed. Section 69.1201 does not require that the penalty factors bear equal weight. 52 Pa. Code § 69.1201. As the Commonwealth Court noted, HIKO does not dispute the applicability of several penalty factors, including: the seriousness of the conduct; whether the conduct was intentional; the number of customers affected; and HIKO's compliance history and the conditional status of its license. 52 Pa. Code § 69.1201(c)(1), (3), (5), (6). Moreover, because Section 69.1201(c)(10) permits the consideration of "other relevant

factors", the egregious conduct of HIKO which is irreducible to the remaining nine factors may still weigh in favor of imposing the ALJs' proposed penalty. 52 Pa. Code § 69.1201(c)(10).

Finally, we agree with the Commonwealth Court that *Herp* has minimal precedential value in this case. Primarily, contrary to HIKO's assertions, the Commission in *Herp* utilized a "per violation" methodology for computing the requisite civil penalty. *Herp v. Respond*, Docket No. C-2014-2413756, (Opinion and Order entered Jan. 28, 2016). Further, *Herp* concerned one customer's complaint stemming from a misleading statement by a third party marketing agent, not the systemic, executive-ordered intentional overcharging of 5,708 customers. *Id.* For the foregoing reasons, the order of the Commonwealth Court is affirmed.

Justices Baer, Todd, Dougherty and Wecht join the opinion.

Justice Donohue files a dissenting opinion in which Chief Justice Saylor joins.