IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Harry Walter,               :
          Petitioner       :
                        :
      v.                   :
                        :
Department of Human Services,  :   No. 267 C.D. 2020
          Respondent      :   Submitted:  February 9, 2021

BEFORE:   HONORABLE ANNE E. COVEY, Judge
               HONORABLE ELLEN CEISLER, Judge
               HONORABLE J. ANDREW CROMPTON, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                         FILED:  March 2, 2021

Harry Walter (Walter) petitions this Court for review of the Department of Human Services (DHS) Bureau of Hearings and Appeals' (BHA) February 6, 2020 Final Administrative Action Order (Final Order) upholding the Administrative Law Judge's (ALJ) Adjudication (Adjudication) denying Walter's appeal. Essentially, Walter presents one issue for this Court's review: whether substantial evidence supported the ALJ's Adjudication.[1]  After review, this Court affirms.

---

[1] Walter lists the following issues in his Statement of Questions Involved: (1) whether David G. Thimons, M.D.'s opinions satisfied Functional Eligibility Determination requirements; and (2) whether the ALJ should have considered Walter's medical documentation that was late-filed due to circumstances beyond Walter's control.  *See* Walter Br. at 4-5.  In his Summary of Argument, Walter asserts that the record evidence does not support the ALJ's conclusion that his discharge from Villa St. Joseph was proper.  *See* Walter Br. at 7.  Because Walter's specified issues are subsumed in this Court's analysis of whether substantial evidence supported the ALJ's Adjudication, they have been combined and will be addressed accordingly herein.

Walter presented a third issue in his Statement of Questions Involved: whether the ALJ afforded the testimony of Walter and Ombudsmen Dawna Bott and Joline Tawlack adequate or appropriate weight.  *See* Walter Br. at 4.  However, in the Argument portion of his brief, Walter

On September 23, 2014, Walter was admitted to Villa St. Joseph, a nursing care facility in Baden, Pennsylvania (Facility). Walter was initially admitted to the Facility's skilled care unit for treatment of, *inter alia*, Wegener's Granulomatosis, a kidney autoimmune and blood disorder, which was exacerbated because it had not been well managed.[2] *See* Certified Record (C.R.) at 383, 385, 387-388. After his condition stabilized, Walter was transferred to the Facility's long-term care unit.[3] *See id.*

In April 2018, Concordia Lutheran Ministries (Concordia) purchased the Facility.[4] *See* C.R. at 363. Thereafter, the Facility's Nursing Care Administrator,

---

declared: "Upon a more in-depth review of the record, [Walter] has determined that this issue does not need to be addressed by [Walter]." Walter Br. at 7.

[2] When Walter was admitted to the Facility in 2014, the Facility had what it called a skilled care unit, where patients recovering from surgery or other hospital stays, falls, or disease exacerbations underwent short-term rehabilitation before transitioning back to home. *See* Certified Record (C.R.) at 387. Under Concordia Lutheran Ministries' (Concordia) ownership, the Facility similarly provides short-term rehabilitation services. *See* www.concordialm.org/locations/concordia-at-villa-st-joseph?service=2499 (last visited 3/1/2021).

[3] At that time, the long-term care unit also provided nursing care and therapy for residents, but on a more intermittent basis. *See* C.R. at 387-388. Under Concordia's ownership, the Facility provides long-term skilled nursing care. *See* www.concordialm.org/locations/concordia-at-villa-st-joseph?service=2496 (last visited 3/1/2021).

[4] Thereafter, the Facility was renamed Concordia at Villa St. Joseph. It is clear from the record that the Facility is a *nursing facility*, which is defined in Section 52.3 of DHS' Regulations as a long-term care facility operated on a profit or non-profit basis by a partnership, association or corporation, enrolled in the Medical Assistance (MA) Program, and licensed by the Pennsylvania Department of Health (DOH). *See* 55 Pa. Code § 52.3. Although neither the Human Services Code, Act of June 13, 1967, P.L. 31, *as amended*, 62 P.S. §§ 101-1503, nor DHS' Regulations define the term *long-term care facility*, the Health Care Facilities Act (which governs facility licensing) defines a *long-term care nursing facility* as "[a] facility that provides either skilled or intermediate nursing care or both . . . to two or more patients, who are unrelated to the licensee, for a period exceeding 24 hours." Section 802.1 of the Health Care Facilities Act, Act of July 19, 1979, P.L. 130, *as amended*, added by Section 7 of the Act of July 12, 1980, P.L. 622, 35 P.S. § 448.802a. Section 201.2 of DOH's Regulations, 28 Pa. Code § 201.2, also incorporates the federal regulations governing long-term care facilities, 42 C.F.R. §§ 483.1-483.75, which define a long-term care facility as a skilled nursing facility that qualifies as an MA services provider. *See* Section 3002(35) of the United States Code, 42 U.S.C. § 3002(35). Section 1181.2 of DHS' Regulations defines *skilled nursing facility services* as those "provided in accordance with the Medicare

2

Rachelle Arnold (Arnold), undertook to meet with the Facility's residents. After meeting and observing Walter, reviewing his medical history, and discussing his current medical status with treating physician and Facility Medical Director, David G. Thimons, M.D. (Dr. Thimons), Arnold determined that Walter's condition had stabilized over the preceding year to the point where he was no longer in need of ongoing skilled nursing care. *See* C.R. at 42-333, 365. Although Walter fell in January 2019, he declined to undergo physical therapy. On June 20, 2019, he began receiving restorative physical therapy for muscle weakness, but surpassed expectations and completed the program ahead of schedule on July 5, 2019. *See* C.R. at 34-35. Notwithstanding, Walter could sit and stand independently, reposition himself in bed with the aid of an enabler bar, and walk independently with a walker. *See* C.R. at 57, 384, 402, 419. Walter's care needs consisted only of administration of his medications, assistance putting on his compression socks, and changing his urinal bottle once each night,[5] all of which could be provided at a personal care home or, possibly, at his home with care services.[6] *See* C.R. at 365, 370, 373-374, 379-380, 386.

---

requirements and which meet the criteria in Appendix E (relating to skilled nursing care) by a facility . . . that is licensed to provide skilled care and is certified to meet the requirements for participation as a provider in the MA Program[,]" 55 Pa. Code § 1181.2, which comply with corresponding federal regulations. *See Fifty Residents of Park Pleasant v. Dep't of Pub. Welfare*, 503 A.2d 1057 (Pa. Cmwlth. 1986). Skilled care services are specified in Appendix E II(a).

[5] However, Walter was capable of emptying his urinal bag each night on his own. *See* C.R. at 373-374.

[6] Section 1001 of the Human Services Code defines "personal care home" as

> any premises in which food, shelter and personal assistance or supervision are provided for a period exceeding twenty-four hours for four or more adults who are not relatives of the operator, who do not require the services in or of a licensed long-term care facility[,] but who do require assistance or supervision in such matters as dressing, bathing, diet, financial management, evacuation of a residence in the event of an emergency or medication prescribed for self administration.

3

On April 4, 2019, pursuant to Section 483.15(c)(1)(i)(B) of the Code of Federal Regulations, 42 C.F.R. § 483.15(c)(1)(i)(B) (relating to facility requirements for transfer and discharge),[7] and Section 201.29(g) of Pennsylvania Department of Health's (DOH) Regulations, 28 Pa. Code § 201.29(g) (relating to notice and appropriate arrangements),[8] Arnold, and Walter's multi-disciplinary team, including Dr. Thimons, approached Walter about being discharged to a personal care home. *See* C.R. at 28, 365-366, 369-372, 418-419, 426. Ombudsman Dawna Bott (Bott) was also in attendance on Walter's behalf. *See* C.R. at 399. On the Facility's behalf, Arnold offered to discharge Walter to Concordia's personal care facility in Wexford, Pennsylvania,[9] and agreed to pay for the portion of his monthly care that would not

---

62 P.S. § 1001.

[7] Section 483.15(c)(1)(i) of the Code of Federal Regulations states, in relevant part:

> The facility must permit each resident to remain in the facility, and not transfer or discharge the resident from the facility unless - . . . [t]he transfer or discharge is appropriate because the resident's health has improved sufficiently so the resident no longer needs the services provided by the facility[.]

42 C.F.R. § 483.15(c)(1)(i).

[8] Section 201.29(g) of DOH's Regulations specifies:

> Unless the discharge is initiated by the resident or resident's responsible person, the facility is responsible to assure that appropriate arrangements are made for a safe and orderly transfer and that the resident is transferred to an appropriate place that is capable of meeting the resident's needs. Prior to transfer, the facility shall inform the resident or the resident's responsible person as to whether the facility where the resident is being transferred is certified to participate in the Medicare and MA reimbursement programs.

28 Pa. Code § 201.29(g). Although a facility is required to offer an appropriate place for the transfer, the resident is not required to accept those specific arrangements. *See* C.R. at 375, 411, 430.

[9] Personal care at Concordia of Wexford consists of residential care in which residents receive professional assistance with activities of daily living, such as bathing and personal hygiene, mobility assistance, wound care, scheduling and transportation for appointments, meals, activities, wellness programs, housekeeping and laundry services, etc., plus 24-hour nursing support, an

4

be covered by his Medicaid benefits (i.e., $1,392.00 per month) from Concordia's benevolent care fund. *See* C.R. at 15, 26, 368-369, 380, 429-431. Walter refused to discuss discharge options, declaring that the only way he was leaving the Facility was either on a gurney or in the back of a police car. *See* C.R. at 365-366, 375-376, 426.

The Facility attempted to include Walter and his wife in Walter's multi-disciplinary team meetings, but they refused and pleaded for the Facility to stop harassing them. *See* C.R. at 28, 366, 374-376, 421. The Facility contacted Walter's Beaver County Office on Aging representative through PA Health & Wellness,[10] who participated in the multi-disciplinary team meetings and attempted to conduct a Level of Care Assessment (Assessment), but Walter refused to complete the Assessment. *See* C.R. at 30, 366, 412. Personal care homes accept residents with need levels from one (least amount of care) to six (most amount of care). *See* C.R. at 373. The Facility's nurses familiar with Walter's care informally completed the Assessment, and determined that Walter's care level was two, primarily because of the large number of medications he had to take. *See* C.R. at 37-40, 373, 378-379.

By August 1, 2019 letter, Arnold notified Walter that he would be discharged from the Facility on September 3, 2019, and transferred to Concordia of Wexford, pursuant to Section 483.15(c)(1)(i)(B) of the Code of Federal Regulations, because Dr. Thimons determined that his health had improved sufficiently that he no longer required the Facility's care or services. *See* C.R. at 15. On August 13, 2019, Walter appealed to the BHA, arguing that it is medically in his best interest to remain at the Facility. *See* C.R. at 8-12. The ALJ conducted a telephone hearing on October 9, 2019. On January 6, 2020, after the record was closed, Walter sent

---

emergency response system and a medical director. *See* www.concordialm.org/locations/concordia-of-wexford?service=844 (last visited 3/1/2021).

[10] PA Health & Wellness is a community-based, coordinated care program.

5

additional documentation to the ALJ, which consisted of a blank Functional Eligibility Determination (FED) form and three physician letters.[11] *See* C.R. at 338.

Thereafter,[12] the ALJ determined, based on the record evidence, that "[Walter's] health ha[d] improved sufficiently [that he] no longer need[ed] the services provided by [the] Facility." C.R. at 345. Accordingly, the ALJ concluded that "[Walter's] appeal should be **denied**[,]" because the Facility's August 1, 2019 notice of discharge was proper and in accordance with Section 483.15 of the Code of Federal Regulations. C.R. at 345. On February 6, 2020, the BHA affirmed the ALJ's Adjudication.[13] *See* C.R. at 336. Walter appealed to this Court.[14] The Facility intervened.

Walter argues that the record evidence does not support the ALJ's Adjudication that Walter no longer requires a skilled level of nursing care and that

---

[11] The ALJ disregarded the additional documents. Section 275.4(h)(2)(iii) of the BHA's Regulations specifies, in relevant part: "[E]xhibits will be due at the time of the hearing[, except] . . . the hearing officer may allow the record to be kept open for 5 working days for the exhibits . . . ." 55 Pa. Code § 275.4(h)(2)(iii). Further, the BHA's decision is limited to the record before it. *See* Section 275.4(g)(6), 55 Pa. Code § 275.4(g)(6) ("[T]he hearing decision will be based solely on the information presented at the hearing . . . ."); *see also* Section 275.4(h)(2)(i) of DHS' Regulations, 55 Pa. Code § 275.4 (h)(2)(i) ("The [ALJ] will restrict his decision to the hearing record, which will consist of testimony and exhibits introduced into [evidence at] the hearing and the notice of action taken by the agency and the appeal of the client."). Notably, the physician letters were dated August 20, September 18, and September 19, 2019, and, thus, could have been presented at the October 9, 2019 hearing.

Walter also appended the documents to his brief to this Court. However, "[i]t is well[ ]settled that the Court may not consider information attached to a brief but not [a] part of the certified record." *Henderson v. Unemployment Comp. Bd. of Rev.*, 77 A.3d 699, 714 n.6 (Pa. Cmwlth. 2013).

[12] The Adjudication is not dated.

[13] Walter filed a request for reconsideration, which the BHA denied on February 25, 2020. *See* C.R. at 347, 351.

[14] "Our review requires that we determine whether [DHS' Final Order upholding the ALJ's A]djudication comports with the applicable law, whether its findings are supported by substantial evidence, and whether any constitutional rights were violated." *Brenckman v. Dep't of Hum. Servs.*, 222 A.3d 38, 42 n.7 (Pa. Cmwlth. 2019) (quoting *Steinberg v. Dep't of Pub. Welfare*, 758 A.2d 734, 736 n.3 (Pa. Cmwlth. 2000)).

On October 26, 2020, DHS notified this Court that it did not intend to file a brief.

his discharge was proper. *See* Walter Br. at 7. Walter specifically contends that an FED was required before the Facility could discharge him, and Dr. Thimons' opinion that Walter's medical needs could be met elsewhere, *see* C.R. at 386, did not satisfy FED criteria. However, Pennsylvania Rule of Appellate Procedure (Rule) 1551(a) declares: "Only questions raised before the government unit shall be heard or considered[.]" Pa.R.A.P. 1551(a); *see also HIKO Energy, LLC v. Pa. Pub. Util. Comm'n*, 209 A.3d 246, 261 (Pa. 2019) ("Generally, a party waives appellate review of a claim when it fails to raise the issue before an administrative tribunal rendering a final decision."); *S.T. v. Dep't of Pub. Welfare, Lackawanna Cnty. Off., Children, Youth & Family Servs.*, 681 A.2d 853, 857 (Pa. Cmwlth. 1996) ("Issues not raised in an agency proceeding are waived and cannot be considered for the first time in a judicial appeal."). Accordingly, because Walter did not raise the FED requirement issue before the ALJ, and he did not present any testimony or documentation to that effect, that issue is waived, and this Court may not address it.

Walter also contends in his Statement of Questions Involved that the ALJ should have considered Walter's late-submitted physician letters because circumstances beyond his control precluded him from offering them at the hearing. *See* Walter Br. at 4-5. However, Walter does not expound upon that issue in the Argument section of his brief. Rather than argue why the ALJ should have considered his late-submitted physician letters, Walter erroneously repeated his waived FED issue heading as follows:[15]

---

[15] The heading for Walter's FED issue stated:

> II. Was the evaluation performed by [Dr. Thimons], indicating that [Walter's] condition had improved and that he no longer needed the services provided by the [Facility], an appropriate evaluation and assessment that satisfied the requirements of a[n] [FED]?

Walter Br. at 7.

7

III. Was the evaluation performed by [Dr. Thimons], indicating that [Walter's] condition had improved and that he no longer needed the services provided by the [Facility], an appropriate evaluation and assessment that satisfied the requirements of a[n] [FED]?

Walter Br. at 19. The error is nevertheless harmless since, to the extent Walter intended Argument III to address the physician letters, he stated thereunder: "Upon a more in-depth review of the record, [Walter] has determined that this issue does not need to be addressed by [Walter]." Walter Br. at 19. Walter provides no additional argument regarding that issue.[16] Under the circumstances, this Court cannot, and need not, further consider that issue.

Regarding Walter's overarching claim that the ALJ's Adjudication was not supported by substantial evidence, "[s]ubstantial evidence is defined as relevant evidence upon which a reasonable mind could base a conclusion." *Ind. Univ. of Pa., State Sys. of Higher Educ. v. Unemployment Comp. Bd. of Rev.*, 202 A.3d 195, 202 (Pa. Cmwlth. 2019).

> In performing a substantial evidence analysis, this Court must view the evidence in the light most favorable to the party who prevailed before the factfinder and draw all reasonable inferences which are deducible from the evidence in favor of the prevailing party. Furthermore, in a substantial evidence analysis where both parties present evidence, it does not matter that there is evidence in the record which supports a factual finding contrary to that made by the factfinder. Rather, the pertinent inquiry is whether there is any evidence which supports the factual finding actually made.

*Borough of Emmaus v. Pa. Lab. Rel. Bd.*, 156 A.3d 384, 393 (Pa. Cmwlth. 2017) (citations omitted).

---

[16] Accordingly, this Court need not address Walter's suggestions in his brief that witnesses may nevertheless have referred to the physician letters at the hearing. *See* Walter Br. at 12-15.

At the hearing in the instant matter, Walter claimed that the Facility's new ownership, rather than his medical stability, is the basis for his discharge. *See* C.R. at 413-414. Walter and his wife[17] repeatedly expressed that they were blind-sided by the Facility's intention to discharge Walter and asserted they were not included in the Facility's determination, but admitted they refused to discuss it with Arnold.[18] *See* C.R. at 398-399. The August, September, and December 2018 and April, June, and September 2019 Physician Order Sheets Walter offered into the record contained Dr. Thimons' statements: "Admit [Walter] to Skilled Level of Care[,]" and "I certify that [Walter] requires nursing facility services." *See* C.R. at 106-107, 109, 113, 115, 118. However, those documents appear to reflect Dr. Thimons' initial admission assessment, and the ALJ/BHA clearly afforded Dr. Thimons' testimony more weight.

Walter and his wife further testified that the Assessment was not formal, and did not take into account that he is also incontinent.[19] *See* C.R. at 399. Walter also asserted that he was doing well because he receives skilled care at the Facility, and he fears that moving to a personal care home will cause his health to decline. *See* C.R. at 413-415. Walter's wife contends that Walter was particularly concerned about not having a physician available at a moment's notice. *See* C.R. at 28. Walter expressed that he would like to continue to live as pain free and comfortable as possible. *See* C.R. at 414. Walter and his wife insisted that, because Walter's social security would be redirected from his wife to the personal care facility, they would face financial disaster, and Walter's wife would become homeless. *See* C.R. at 399-400, 415, 433. Accordingly, Walter's wife represented

---

[17] Walter's wife is his power of attorney. *See* C.R. at 398.

[18] Walter and his wife were not represented by counsel at the hearing.

[19] Arnold testified that Walter's incontinence would not change his Assessment score. *See* C.R. at 379.

that she would not allow Walter's transfer to a personal care home but, rather, would care for Walter at home. *See* C.R. at 399-400, 423, 433.

Bott testified on the Walters' behalf that, although Walter's condition has been stable over the prior year, he fell in January 2019, he received physical therapy from June 20 to July 5, 2019, and he requires an enabler bar to reposition himself in bed. *See* C.R. at 34-35, 402-403. Although both Bott and Ombudsman Joline Tawlack (Tawlack) opined that Walter's needs would be better cared for at the Facility than at a personal care home, the ALJ found that neither demonstrated they were medically qualified to render such opinions. *See* C.R. at 344, 404, 408. Bott also expressed concern that the Facility is not offering Walter a choice of personal care homes, but is suggesting and only offering to pay toward Concordia of Wexford. *See* C.R. at 403.

Walter's PA Health & Wellness care service coordinator Madeline Martinez (Martinez) testified regarding her concern that Walter and his wife were not included in conversations about his potential discharge or transfer, and that a personal care home may not financially be an option for them. *See* C.R. at 409. Martinez explained:

> The requirements to receive home and community[-]based services [(HCBS)] at home are the same as they would be to reside in a nursing home. So if he is not eligible to be in a nursing home, he will go home without those services as well. And I am concerned for anyone who has been receiving the highest level of care for five years to suddenly go home with no care at all.

> While there are other community-based services, they are not nearly as extensive and I'm not sure how that transition of such a drastic level of care difference would be for anyone.

10

C.R. at 410. Martinez acknowledged that Walter refused to participate in the Assessment that would determine whether or not Walter continued to qualify for skilled nursing care. *See* C.R. at 412.

The Assessment and the uncontroverted testimony offered by Arnold, Dr. Thimons, the Facility's Director of Nursing Angela McCray, and the Facility's Director of Physical Therapy Kim Pardi support that Walter's physical condition had been stable for at least one year, and that his needs as of August 1, 2019, could be met at a personal care home.[20] *See* C.R. at 356, 368, 370-371, 383-384. The Facility's witnesses acknowledged Walter's concerns, and did not dispute that Walter requires ongoing care,[21] only that such care need not be provided in the Facility's skilled nursing home environment. *See* C.R. at 371, 386.

Arnold explained that DOH's Regulations, which govern the Facility, mandate that each resident in a skilled nursing care facility have a discharge plan

---

[20] Arnold stated:

> Walter's refusal to consider transfer to another facility that is appropriate to meet his care needs has made it impossible for [the Facility] to provide skilled nursing care that is truly needed and medically appropriate for one of the many people on [its] current waiting list. By discharging [] Walter to an appropriate level of care, Concordia will be able to appropriately care not only for [] Walter, but also care for another patient who is currently waiting for skilled nursing care at [the Facility].

C.R. at 372. Arnold added: "[O]ur desire at Concordia [is] to not only be upstanding in the ways we uphold the federal and state regulations, but to hold to our mission, which is to serve as many people as we can who need the environment." C.R. at 390-391. Arnold further explained:

> [T]he total cost [for Walter] to be in the personal care [at Concordia of Wexford] would be $3,050[.00] a month. . . . [I]t's over $10,000[.00] a month to reside in skilled nursing [at the Facility], . . . that's another reason the government doesn't want us to keep people at inappropriate levels of care.

C.R. at 429.

[21] Although the Facility's witnesses acknowledged that Walter was in need of *long-term care*, it is clear based on this case's context that they meant *ongoing* care rather than long-term skilled nursing care.

11

that provides for periodic needs evaluations and assured placement in an appropriate level of care. *See* C.R. at 18-21, 366-367, 425. She added that federal regulations authorize the Facility to transfer or discharge residents whose health has improved sufficiently such that he or she no longer needs the care provided at the Facility. *See* C.R. at 23-24, 367-368. Arnold recounted that "there have been no [] orders from [] Walter's consulting physicians indicating that he must have care in a skilled nursing facility[;] [o]nly that he should continue to receive long[-term] care." C.R. at 371. Arnold described that, at the personal care home, just like at the Facility, nurses would be available to Walter 24/7, physicians, physician assistants, and nurse practioners would make rounds and also be available on-call as needed, he would continue to be treated by his outside physicians, and he would be transported by ambulance to the nearest hospital for emergency care. *See* C.R. at 369-371. Arnold confirmed that "[Walter] will not be given an additional charge to reside in personal care [at Concordia of Wexford.]" C.R. at 368; *see also* C.R. at 26, 394, 429-430.

Dr. Thimons testified that he has treated Walter since he was admitted to the Facility in September 2014. *See* C.R. at 385. He recalled that, with the exception of the occasional cough, cold, chest pains, or other acute medical issue, Walter's "underlying condition of Wegener's has been fairly stable" and, from a purely objective medical standpoint, [] Walter's needs could be met elsewhere[,]" possibly even at home. C.R. at 386. Dr. Thimons acknowledged telling Walter on May 13, 2019, that he was running out of reasons to keep Walter at the Facility. *See* C.R. at 28, 388-389, 407. On the June 2019 Face Sheet admitted into the record, Dr. Thimons designated Walter's Level of Care as "Non-Skilled." C.R. at 71.

"[T]he [ALJ], as the fact-finder, is charged with the responsibility of resolving conflicts in testimony and may reject the testimony of any witness." *Brenckman v. Dep't of Hum. Servs.*, 222 A.3d 38, 46 n.15 (Pa. Cmwlth. 2019) (quoting *Godown v. Dep't of Pub. Welfare*, 813 A.2d 954, 958 (Pa. Cmwlth. 2002)).

12

Here, pursuant to Section 483.15(c)(1)(i)(B) of the Code of Federal Regulations, the ALJ concluded based on the evidence that "[Walter's] condition is currently stable and has been stable for a prolonged period of time[,]" such that he is no longer in need of the skilled services provided by the Facility. C.R. at 344. The ALJ further concluded, in accordance with Section 201.29(g) of DOH's Regulations, that Walter's discharge would be to an appropriate place capable of meeting his needs, reasoning:

> The Facility proposed to discharge [Walter] to Concordia of Wexford, a personal care home. At the hearing on October 9, 2019, neither [Walter] nor his wife presented testimony to demonstrate that [Walter's] discharge to Concordia of Wexford would be unsafe for [Walter]. Rather, [Walter's] wife testified [Walter] is not going to a personal care home because they cannot afford it, and she would take [Walter] home. [Walter's] wife is free to care for her husband at home, and she did not demonstrate that she is unable to care for her husband at home. Additionally, [Martinez] testified [Walter] may not be eligible for HCBS[,] as HCBS requires skilled nursing level of care. However, since [Walter] refused to participate in Beaver County [Office on Aging's] level of care assessment, [Walter's] eligibility for HCBS is speculative at this point. Additionally, [Martinez] testified there are other community-based services available to [Walter].

C.R. at 345.

Viewing the evidence in the light most favorable to the Facility, as we must, this Court concludes that the record contains substantial evidence to support the ALJ's findings and conclusions that the Facility discharged Walter in accordance with Section 483.15(c)(1)(i)(B) of the Code of Federal Regulations and Section 201.29(g) of DOH's Regulations. Accordingly, the BHA properly upheld the ALJ's Adjudication.

13

Based on the foregoing, the BHA's Final Order is affirmed.


_____

ANNE E. COVEY, Judge

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Harry Walter,                    :
               Petitioner        :
                              :
              v.                   :
                              :
Department of Human Services,    :    No. 267 C.D. 2020
               Respondent        :

## O R D E R

AND NOW, this 2nd day of March, 2021, the Department of Human Services Bureau of Hearings and Appeals' February 6, 2020 Final Administrative Action Order is affirmed.

_____
ANNE E. COVEY, Judge.