IN THE SUPREME COURT OF PENNSYLVANIA
EASTERN DISTRICT

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.**

| | | |
|---|---|---|
| MICHAEL AND MELISSA SULLIVAN, H/W | : | No. 18 EAP 2022 |
| | : | |
| | : | Appeal from the Judgment of |
| v. | : | Superior Court entered on April 15, |
| | : | 2021 at No. 3086 EDA 2019 |
| | : | (reargument denied June 23, 2021), |
| WERNER COMPANY AND LOWE'S | : | affirming the Judgment entered on |
| COMPANIES, INC., AND MIDDLETOWN | : | November 19, 2019 in the Court of |
| TOWNSHIP LOWE'S STORE #1572 | : | Common Pleas, Philadelphia |
| | : | County, Civil Division at No. |
| | : | 161003086. |
| APPEAL OF: WERNER COMPANY AND | : | |
| LOWE'S COMPANIES, INC. | : | ARGUED: March 8, 2023 |

## OPINION ANNOUNCING THE JUDGMENT OF THE COURT

**JUSTICE MUNDY**                          **DECIDED: December 22, 2023**

We granted allowance of appeal to consider whether evidence of a product's compliance with industry and governmental safety standards is admissible in products liability cases following this Court's decision in *Tincher v. Omega Flex, Inc.*, 104 A.3d 328 (Pa. 2014). Because we conclude compliance evidence remains inadmissible, we affirm the order of the Superior Court.

## I. LEGAL BACKGROUND

As legal background, Pennsylvania has adopted Section 402A of the Second Restatement of Torts as the law of strict products liability. *Webb v. Zern*, 220 A.2d 853, 854 (Pa. 1966). Section 402A provides:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

      (a) the seller is engaged in the business of selling such a product, and

      (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

      (a) the seller has exercised all possible care in the preparation and sale of his product, and

      (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

RESTATEMENT (SECOND) OF TORTS § 402A.

In *Tincher*, this Court overruled *Azzarello v. Black Brothers Co., Inc.*, 391 A.2d 1020 (Pa. 1978). *Azzarello* and its progeny had held that Section 402A contained negligence concepts, such as "defective condition" and "unreasonably dangerous," that had no place in strict products liability jury instructions because they confused the jury. Instead, *Azzarello* concluded the trial court had to decide, as a matter of law, whether "recovery would be justified; and only after this judicial determination [was] made [was] the cause [of action] submitted to the jury to determine whether the facts of the case support[ed] the averments of the complaint." *Azzarello*, 391 A.2d at 1026. In *Tincher*, this Court reaffirmed that Pennsylvania was a "Second Restatement jurisdiction," 104 A.3d at 399, and overruled *Azzarello*'s narrow construction of Section 402A that prevented the jury from considering negligence-related rhetoric and concepts, *id.* at 376.

The *Tincher* Court explained that a seller of a product has a duty to provide a product that is free from "a defective condition unreasonably dangerous to the consumer

or [the consumer's] property." *Id.* at 383 (citing RESTATEMENT (SECOND) OF TORTS § 402A(1)) (brackets in original). To prove a breach of this duty, "a plaintiff must prove that a seller (manufacturer or distributor) placed on the market a product in a 'defective condition.'" *Id.* at 384. The *Tincher* Court then analyzed the evidence necessary to prove a defective condition in a design defect case, holding "the cause of action in strict products liability requires proof, in the alternative, either of the ordinary consumer's expectations or of the risk-utility of a product." *Id.* at 401. Under the consumer expectations test, "the product is in a defective condition if the danger is unknowable and unacceptable to the average or ordinary consumer." *Id.* at 387. Under the risk-utility test, "a product is in a defective condition if a 'reasonable person' would conclude that the probability and seriousness of harm caused by the product outweigh the burden or costs of taking precautions." *Id.* at 389. The Court stated that a plaintiff may proceed under either theory, or both theories in the alternative. *Id.* at 408.

Significant to this opinion, this Court had concluded, when *Azzarello* was the law, that evidence of industry and governmental standards was not admissible in strict products liability cases because such evidence went to the reasonableness of the manufacturer's design choice, which improperly injected negligence concepts such as due care into strict liability cases and misled the jury from the product's design. *Lewis v. Coffing Hoist Div., Duff-Norton Co., Inc.*, 528 A.2d 590, 594 (Pa. 1987); *see also Gaudio v. Ford Motor Co.*, 976 A.2d 524, 544 (Pa. Super. 2009) (listing cases extending *Lewis* to evidence of compliance with government standards). The *Tincher* Court discussed *Lewis*'s conception of strict liability and its conclusion that compliance evidence was not relevant to the condition of the product and therefore inadmissible in strict liability actions. *Tincher*, 104 A.3d at 368. However, *Tincher* did not overrule *Lewis* or decide whether evidence of compliance with industry and government standards was admissible in a

design defect case. *Id.* at 410 (stating "[t]his [o]pinion does not purport to either approve or disapprove prior decisional law . . . relating to foundational or subsidiary considerations and consequences of our explicit holdings."). Instead, the *Tincher* Court recognized:

> [T]he decision to overrule *Azzarello* and articulate a standard of proof premised upon alternative tests in relation to claims of a product defective in design may have an impact upon other foundational issues regarding manufacturing or warning claims, and upon subsidiary issues constructed from *Azzarello*, such as the availability of negligence-derived defenses . . . . These considerations and effects are outside the scope of the facts of this dispute[.]

*Id.* at 409 (citation omitted).[1] Additionally, the Court noted that the "common law regarding these considerations should develop within the proper factual contexts against the background of targeted advocacy." *Id.* at 410.

Following *Tincher*, our Court has not addressed the admissibility of evidence of industry or government standards. However, the Superior Court, in *Webb v. Volvo Cars of North America*, 148 A.3d 473 (Pa. Super. 2016), concluded "the overruling of *Azzarello* does not provide this panel with a sufficient basis for disregarding the evidentiary rule expressed in *Lewis* and *Gaudio*." 148 A.3d at 483. Specifically, the *Webb* Court was not persuaded that *Tincher* undermined *Lewis*'s rationale that a design defect could be widespread in an industry. *Id.* Additionally, the Superior Court noted that *Webb* was not a post-*Tincher* case because it was tried under *Azzarello* and pending on appeal when *Tincher* was decided, allowing the parties to brief and argue the effects of *Tincher*. *Id.* Because of the procedural posture of the case, the Superior Court opined that "the continued vitality of the prohibition on government and industry standards evidence is a

---

[1] As alluded to, "[t]here are three different types of defective conditions that can give rise to a strict liability claim: design defect, manufacturing defect, and failure-to-warn defect." *Phillips v. A-Best Prods. Co.*, 665 A.2d 1167, 1170 (Pa. 1995).

question best addressed in a post-*Tincher* case." *Id.* This Court denied allocatur in *Webb*. *Webb v. Volvo Cars of N. Am., LLC*, 168 A.2d 1294 (Pa. 2017).

## II. FACTS AND PROCEDURAL HISTORY

Against this legal background, the relevant factual and procedural history of this case is as follows. Appellee Michael Sullivan was seriously injured at a jobsite when the platform of a six-foot tall mobile scaffold collapsed, causing him to fall through the scaffold to the ground. The platform of the scaffold was secured to the frame by two spring-loaded deck pins that the user rotated to cover the platform after it was seated in the scaffold. Sullivan brought a strict liability action against Appellants Werner Company (Werner) and Lowe's Companies, Inc. (Lowe's), alleging that the mobile scaffold system was defectively designed because it was possible for a user to inadvertently rotate the deck pins off the platform during normal use.[2]

Before trial, Sullivan filed a motion in limine to preclude Appellants from admitting into evidence any industry or government standards. Mot. in Lim., 4/11/19 (R.R. at 105a). The motion noted that Appellants' expert, Erick Knox, Ph.D, P.E., submitted a report suggesting the scaffold met federal Occupational Safety and Health Administration (OSHA) regulations and American National Standards Institute (ANSI) standards. Sullivan attached as an exhibit Knox's expert report, which stated that the product's "spring loaded inverted 'L' shaped pin is the design of choice by most manufacturers," and "[t]his design is compliant with ANSI and OSHA safety standards and is a reasonably safe design for the function of holding a properly seated platform in position." *Id.* at Ex. A, ESi Investigative Report, 11/13/18 (R.R. at 145a); *see also id.* (R.R. at 148a) (opining the product met ANSI A10.8-2011 Scaffold Safety Requirements and OSHA 1926

---

[2] Sullivan also brought a negligence claim, which he withdrew at trial. N.T., 4/29/19, at 120 (R.R. at 411a). His wife also asserted a consortium claim that did not succeed at trial. N.T., 5/10/19, at 7 (R.R. at 2154a).

Subpart L).  Sullivan argued that such evidence was inadmissible under Pennsylvania law, citing to *Lewis*, *Normann v. Johns-Manville Corp.*, 593 A.2d 890, 893 (Pa. Super. 1991), and *Carrecter v. Colson Equipment Co.*, 499 A.2d 326, 330 (Pa. Super. 1985). Mot. in Lim., 4/11/19 (R.R. at 107a).  Further, Sullivan maintained that *Tincher* did not affect this admissibility of evidence standard, as the Superior Court affirmed in *Webb*. *Id.* In response, Appellants argued that they would provide fact witnesses and expert testimony to establish the scaffold met OSHA and ANSI standards, which they contended was admissible post-*Tincher* because such evidence was "relevant and probative of the issue of product defect; whether the manufacturer acted reasonably; and/or whether the product is unreasonably dangerous."  Resp. in Opp'n to Sullivan's Mot. in Lim., 4/22/19 (R.R. at 162a).  After hearing oral argument on the motion during trial, the trial court granted the motion and precluded any evidence of industry and government standards by deferring to the *Webb* decision.  N.T., 4/30/19, at 4-10 (R.R. at 547-53a) (noting "I wouldn't be comfortable either way with this one, I'm going to grant the motion to preclude talk about industry standards.  The [S]uperior [C]ourt has the final word on it").

Because Sullivan attempted to prove the scaffold was defective through the risk-utility theory, the trial court instructed the jury as follows:

> Under the risk utility test[,] a product is defective if a reasonable person would conclude that the possibility and seriousness of harm outweighed the burden or cost to the manufacturer of making the product safe.
>
> To decide whether the product is defective under this test, you should consider the following factors:  The usefulness and desirability of the product, its utility to the user and to the public as a whole, the safety aspects of the product, the likelihood that it will cause injury, and the probable seriousness of the injury, the availability of a substitute product which would meet the same need and not be as unsafe, the manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility, the user's ability

to avoid danger by the exercise of care in the use of the product, the user's anticipated awareness of the dangers inherent in the product and their availability, because of the general public knowledge of the obvious condition of the product or the existence of suitable warnings or instructions.

You may not consider any negligence, that is lack of due care, by Plaintiff, Michael Sullivan, when performing this test for defectiveness. Rather, you must consider what product a reasonable manufacturer would design, given all the factors listed above.

N.T., 5/9/19, at 113-14 (R.R. at 1181a-82a).

During its deliberations, the jury asked the trial court "[d]oes OSHA inspect every product that is put on the market, especially those with patent?" N.T., 5/9/19, at 142 (R.R. at 2117a). The trial court responded that it could not answer that question and instructed the jury not to consider OSHA in any way during its deliberations. *Id.* Additionally, the jury asked to physically inspect an exemplar scaffold that was introduced as evidence during trial. *Id.* at 143 (R.R. at 2118a). The trial court permitted the jurors to examine it with court staff present, outside the presence of the attorneys and the trial judge, and defense counsel covered the ANSI and OSHA certification stickers with exhibit stickers so the jury would not see them during its inspection. *Id.* at 148-49 (R.R. at 2123-24a). The next day, the jury also asked to see three other scaffolds that were not involved in the accident, which the trial court permitted after counsel obscured the certification stickers. N.T., 5/10/19, at 4-5 (R.R. at 2153-54a). Ultimately, the jury found New Werner and Lowe's liable on the design defect claim and awarded Sullivan $2.5 million in damages. *Id.* at 7 (R.R. at 2154a).

Following trial, Appellants filed a motion for post-trial relief, arguing in part that they were entitled to a new trial because "[t]he court improperly precluded defendant from presenting evidence that its product complied with relevant industry standards and OSHA regulations, a significant issue raised by the jury at the outset of their deliberations." Mot.

for Post-Trial Relief, 5/20/19, at 14 (R.R. at 232a) (emphasis in original).  In his response to the post-trial motion, Sullivan relied on *Webb*, which he asserted "affirmed that, post-*Tincher*, evidence of compliance with government and industry standards is still inadmissible."  Resp. in Opp'n to Mot. for Post-Trial Relief, 5/30/19, at 29 (R.R. at 269a).

The trial court denied Appellants' motion for post-trial relief.  Order, 9/12/19 (R.R. at 291a).  In its opinion, the trial court explained it was persuaded by the Superior Court's analysis in *Webb* concluding there was no justification post-*Tincher* to abandon the prohibition on evidence of government or industry standards.  Trial Ct. Op., 8/3/20, at 16.  Appellants appealed to the Superior Court.

In a unanimous published opinion, the Superior Court affirmed the trial court.  *Sullivan v. Werner Co.*, 253 A.3d 730 (Pa. Super. 2021).  The Superior Court provided three reasons that it found the trial court did not abuse its discretion in excluding evidence of the manufacturer's compliance with industry and government standards.  First, following *Tincher*, the court recognized Section 402A of the Second Restatement remains the standard which Pennsylvania courts use to determine whether a product is "unreasonably dangerous," and Section 402A provides that a product that is designed and manufactured with "all possible care" can still be defective.  *Sullivan*, 253 A.3d at 746.  Second, the Superior Court acknowledged that *Tincher*'s overruling of *Azzarello* cast some doubt on *Lewis* and *Gaudio*.  *Id.*  However, the court noted *Tincher* stated that its impact on subsidiary issues, such as this one, should develop as common law within the proper factual contexts, and no Pennsylvania court has held that *Tincher* implicitly overruled *Lewis* or *Gaudio*.  *Id.*  Third, the Superior Court observed that a manufacturer's compliance with industry or government standards goes to whether it exercised due care but not to whether it defectively designed the product.  *Id.* at 747.  The court continued that under Section 402A, "it is irrelevant if a product is designed with all possible care,

including whether it has complied with all industry and governmental standards, because the manufacturer is still liable if the product is unsafe." *Id.* Finding that *Tincher* did not explicitly or implicitly overrule pre-existing precedent excluding compliance evidence and that Section 402A provides a reason to exclude such evidence, the Superior Court concluded the trial court did not abuse its discretion in excluding the evidence in this case. *Id.* at 747-48.

## III. ISSUE AND STANDARD OF REVIEW

This Court granted Appellants' petition for allowance of appeal to consider the following issue:

> Was it an error of law, under the product liability principles this Court established in *Tincher v. Omega Flex, Inc.*, 104 A.3d 328 (Pa. 2014), to prevent the jury from considering the product's compliance with pertinent industry and governmental safety standards, where this exclusion of evidence:
>
> (1) was contrary to *Tincher*'s expressed intent to provide juries with greater, rather than less, ability to decide if an unreasonably dangerous defect exists in a product;
>
> (2) was contrary to *Tincher*'s recognition that strict liability and negligence substantially overlap in product liability cases, particularly as to the "risk/utility" defect theory plaintiffs pursued in this case; and
>
> (3) would once again leave Pennsylvania product liability law in a distinct minority position, concerning admissibility of compliance evidence.

*Sullivan v. Werner Co.*, 279 A.3d 1183 (Pa. 2022) (per curiam).

This Court generally reviews a trial court's evidentiary rulings, including the decision to grant or deny a motion in limine, for an abuse of discretion. "An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality,

prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." *Commonwealth v. Dengler*, 890 A.2d 372, 379 (Pa. 2005) (quoting *Grady v. Frito-Lay, Inc.*, 839 A.2d 1038, 1046 (Pa. 2003)). Further, a decision that overrides or misapplies the law constitutes an abuse of discretion. *Commonwealth v. Randolph*, 873 A.2d 1277, 1281 (Pa. 2005) (quoting *Commonwealth v. McAleer*, 748 A.2d 670, 673 (Pa. 2000)). However, we exercise plenary review when a trial court's evidentiary ruling turns on a question of law. *Schroeder v. Jaquiss*, 861 A.2d 885, 889 n.8 (Pa. 2004). Here, the issue turns on a question of law, *i.e.*, the admissibility of evidence of compliance with governmental or industry safety standards in strict liability design defect cases.

### IV. PARTIES' ARGUMENTS

Appellants argue that compliance evidence should be admissible, when relevant, following *Tincher* and the adoption of Pennsylvania Rules of Evidence 401 and 402. They emphasize *Tincher* reshaped products liability law by overruling *Azzarello*, removing the absolute separation of negligence and strict liability, returning to the jury Section 402A's "unreasonably dangerous" element, rejecting the notion that product suppliers are "guarantors" of the product's safety, and endorsing a composite test incorporating consumer expectations and risk-utility. Appellants' Brief at 18.

Because *Tincher* returned the unreasonably dangerous inquiry to the jury, Appellants contend we should reinstate "the pro-admissibility evidentiary principles that existed pre-*Azzarello*." *Id.* at 19. Before *Azzarello*, Appellants explain, compliance evidence was admissible as relevant to proving product defect. *Id.* at 19-20 (discussing *Forry v. Gulf Oil Corp.*, 237 A.2d 593 (Pa. 1968)). Appellants also note that this Court held evidence of a manufacturer's customary practice was admissible as tending to show that the product was not defective or unreasonably dangerous when it left the manufacturer's control. *Id.* at 20 (citing *Bialek v. Pittsburgh Brewing Co.*, 242 A.2d 231,

235 (Pa. 1968). The evidence was admissible even though it also tended to show due care because "[i]t is elementary that evidence admissible for one purpose is not rendered inadmissible because it would be inadmissible for another purpose and the jury might improperly consider it for that other purpose." *Id.* at 20 (quoting *Bialek*, 242 A.2d at 235). Further, Appellants clarify that courts held either party could introduce compliance evidence on the question of whether a product was unreasonably dangerous under Section 402A. Appellants' Brief at 21 (citing *Berkebile v. Brantly Helicopter Corp.*, 281 A.2d 707, 710 (Pa. Super. 1971) (permitting evidence of the seller's compliance with Federal Aviation Agency regulations to show the product was not unreasonably dangerous)). Appellants urge us to return to this pre-*Azzarello* common law holding that compliance evidence is admissible.

To bolster their pre-*Azzarello* common law argument, Appellants assert that Pennsylvania Rules of Evidence 401 and 402, adopted in 1998, endorse a liberal approach to relevancy, defining relevant material as evidence that "has any tendency to make a fact more or less probable than it would be without the evidence." *Id.* at 22 (quoting Pa.R.E. 401(a)). The combination of *Tincher* and the Rules of Evidence, in Appellants' view, favors the admission of compliance evidence, which they claim goes to the "material fact" in strict liability of the existence of a "defective condition unreasonably dangerous." *Id.* (quoting *Tincher*, 104 A.3d at 400).

Appellants argue that *Tincher*'s overruling of *Azzarello* must extend to *Lewis*. *Id.* at 24. They contend that *Lewis*'s *per se* exclusion of compliance evidence was based on *Azzarello*'s conception of strict liability in which the seller was the guarantor of product safety, and the jury did not decide whether the product was unreasonably dangerous. *Id.* at 25. Because *Tincher* overruled *Azzarello* on these points, Appellants assert "*Tincher* demolished *Lewis*' *Azzarello*-based reasoning, leaving nothing standing." *Id.* at 26.

Moreover, Appellants criticize *Lewis* for sidestepping a relevancy analysis and instead applying *Azzarello*. *Id.* at 30. They also note that "*Lewis* recognized that, in other jurisdictions applying the same defect standards that *Tincher* now follows, standards compliance evidence is 'relevant to the question of whether a product design is 'unreasonably dangerous[.]'" *Id.* at 31 (quoting *Lewis*, 528 A.2d at 593-94). Accordingly, as the *Lewis per se* exclusionary rule is inconsistent with *Tincher* and the Rules of Evidence, Appellants urge us to discard *Lewis* in favor of a relevance-based rule in which compliance evidence is generally admissible. *Id.* at 33-34.[3]

To support their relevance-based approach, Appellants invoke *Tincher*'s composite approach to product defect, employing both the consumer expectations and risk-utility tests. *Id.* at 34. They argue that compliance evidence is relevant in this composite framework. *Id.* at 37. Seizing on *Tincher*'s description of the risk-utility test as reflecting the "negligence roots of strict liability" and centered on a "*post hoc*" analysis of "whether a manufacturer's conduct in manufacturing or designing a product was reasonable," Appellants maintain the risk-utility test "captures 'traditional negligence' principles, such as the reasonable foreseeability of harm caused by the defendant's action." *Id.* at 38 (quoting *Tincher*, 104 A.3d at 404-05). In Appellants' view, industry standards and governmental regulations contribute to the condition of the product. *Id.*[4]

---

[3] *Amici curiae* Pennsylvania Coalition for Civil Justice Reform, Pennsylvania Manufacturers' Association, and American Property Casualty Insurance Association argue that we should overrule *Lewis* and eliminate the *per se* exclusion of compliance evidence in design defect cases. Amici Br. at 5. *Amici* view *Lewis*'s bright-line rule as incompatible with *Tincher*'s holding that the consumer expectation and risk/utility tests apply in strict liability. *Id.* at 9. Further, *Amici* assert that plaintiffs pursuing a design defect case are challenging the choices in the manufacturer's design. *Id.* at 11. Depriving the jury of compliance evidence, in *Amici's* view, forces the jury to decide whether the design was defective in a vacuum. *Id.* at 12.

[4] *Amicus curiae* Philadelphia Association of Defense Counsel (PADC) maintains compliance evidence is relevant in design defect cases because government and industry (continued…)

Appellants claim that compliance evidence is relevant to juries deciding the risk/utility question: "[w]ithout this highly probative information, a jury of laypersons is forced to rely solely on the often limited opinions of the parties' paid litigation experts, or else to make uninformed guesses about how a manufacturer should appropriately balance safety, feasibility, and cost." *Id.* at 39.[5] Appellants highlight that this case illustrates that point because the jury during its deliberations asked whether OSHA inspects every product that is put on the market. *Id.* at 40.

Additionally, Appellants discuss persuasive authority supporting their position. Appellants state that "[a]t least 45 states and the District of Columbia consider compliance evidence admissible." *Id.* at 41-42 (citing Daller & Daller, "Product Liability Desk Reference: A Fifty-State Compendium" (Wolters Kluwer, 2021 mid-year); 1 Owen & Davis on Products Liability § 6:9, at 578 and 591 (4th ed. Supp. 2021)).[6] Appellants emphasize

---

standards are the starting point for the design of any product, and compliance evidence relates to several elements of the risk/utility test and the consumer's expectations, such as "acknowledged risks, the product's utility, and the feasibility or wisdom of alternative designs." PADC's *Amicus* Br. at 23.

Likewise, *Amicus curiae* the U.S. Chamber of Commerce (USCC) argues that compliance evidence is relevant because manufacturers rely on industry and government standards as guideposts when designing a product. USCC's Amicus Br. at 6. Further, *Amicus* suggest compliance should be a defense to products liability claims to incentivize manufacturers to comply with safety standards. *Id.* at 8.

[5] *Amicus curiae* International Association of Defense Counsel (IADC) argue that compliance evidence can be relevant to the risk/utility factors and to the credibility of experts, but it should not be categorically admissible or inadmissible. IADC's *Amicus* Br. at 3. Instead, if it is relevant, it should be subject to the ordinary rules of evidence, including Rule 403's exclusion of evidence when certain dangers outweigh the probative value. *Id.* at 10. Here, it was relevant to several risk/utility factors and should have been admitted in IADC's view. *Id.* at 5-7.

[6] *Amicus curiae* The Product Liability Advisory Council (PLAC) offers a chart detailing the case law of other jurisdictions, showing most jurisdictions have held compliance evidence is admissible. PLAC's *Amicus* Br. at 3-12. PLAC notes these decisions are "rooted in the fundamental norms of faith in the jury system and commitment to maximum transparency in the factfinding process." *Id.* at 13.

that the jurisdictions from which *Tincher* derived the composite test, California and Illinois, have held standards compliance evidence is admissible in strict liability. *Id.* at 42-43 (discussing *Kim v. Toyota Motor Corp.*, 424 P.3d 290 (Cal. 2018), and *Calles v. Scripto-Tokai Corp.*, 864 N.E.2d 249 (Ill. 2007)).

Appellants criticize the Superior Court's reliance on *Webb* for the proposition that "the *Lewis/Gaudio* evidentiary prohibition remained good law" after *Tincher*. *Id.* at 46 (quoting *Sullivan*, 253 A.3d at 743). Instead, Appellants point out that *Webb* demurred on the question, expressing a preference to address the question in a post-*Tincher* case. *Id.* (citing *Webb*, 148 A.3d at 483). Further, Appellants fault the Superior Court for attempting to reinstate the divide between the due care and conduct of the manufacturer and the condition of the product, which they view as "parrot[ing] *Azzarello* without using the name." *Id.* at 47. Appellants assert the Superior Court should have recognized that compliance evidence has a Rule 401 tendency to prove both the manufacturer's conduct and the condition of the product. *Id.* Even if the evidence remains inadmissible as to the manufacturer's conduct, Appellants claim it should be admissible on the product defect issue and reemphasize that "evidence admissible for one purpose is not rendered inadmissible because it would be inadmissible for another purpose[.]" *Id.* at 47-48 (quoting *Bialek*, 242 A.2d at 235). If misleading the jury is a concern in a particular case, Appellants propose that "such issues may be alleviated in the usual way, with limits on argument and jury instructions." *Id.* at 48.[7] In sum, Appellants' position is that compliance

---

[7] *Amicus curiae* The Pennsylvania Defense Institute (PDI) maintains *Tincher* rendered *Lewis*'s exclusionary rule obsolete because *Lewis* was based on the premise that negligence concepts have no place in strict liability. PDI argues that under the Rules of Evidence, all relevant evidence is admissible unless otherwise provided by law. Because compliance evidence is relevant, *Amicus* contends it should be admissible, subject to limiting instructions to assist the jury in properly considering it. PDI's *Amicus* Br. at 13 ("[c]omparison of a finished product to a regulation or standard yields direct evidence, requiring no process of inference, about its condition, quality and fitness[,]" which does not implicate a manufacturer's due care).

evidence should be admissible when relevant, subject to the other rules of evidence, as the trial court may limit its improper consideration with jury instructions.

In contrast, Sullivan argues compliance evidence pertains solely to due care, which is ultimately irrelevant because Section 402A states that a seller is strictly liable "although the seller has exercised all possible care in the preparation and sale of [its] product." Sullivan's Brief at 23 (quoting RESTATEMENT (SECOND) OF TORTS § 402A). *Tincher*, in Sullivan's view, maintained Section 402A as the standard for product liability and did not overrule *Lewis*. *Id.* at 26. Sullivan further notes that *Tincher* declined to adopt the Third Restatement of Torts, which includes negligence principles in its characterization of design defect and permits the admissibility of the product's compliance with applicable safety standards and regulations as nonconclusive evidence of product defect. *Id.* at 28-29 (discussing RESTATEMENT (THIRD) TORTS: PRODUCTS LIABILITY §§ 2, 4).[8] Sullivan

---

[8] The Third Restatement defines the three categories of product defect as follows:

> A product is defective when, at the time of sale or distribution, it contains a manufacturing defect, is defective in design, or is defective because of inadequate instructions or warnings. A product:
>
> > (a) contains a manufacturing defect when the product departs from its intended design even though all possible care was exercised in the preparation and marketing of the product;
> >
> > (b) is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe;
> >
> > (c) is defective because of inadequate instructions or warnings when the foreseeable risks of harm posed by the product could have been reduced or avoided by the

(continued…)

argues that Appellants are attempting to achieve a result that is inconsistent with the framework for products liability that *Tincher* articulated. *Id.* at 30.

Additionally, Sullivan accuses Appellants of misrepresenting *Tincher* to support their argument that *Tincher* eliminated the divide between negligence and strict liability. *Id.* at 31. For instance, Sullivan notes that Appellants cite *Tincher* as stating the divide is unnecessary because "[i]n design cases the character of the product and the conduct of the manufacturer are largely inseparable," which Sullivan points out is a quote from then-Justice Saylor's concurrence in *Phillips v. Cricket Lighters*, 841 A.2d 1000, 1015 (Pa. 2003) (Saylor, J., concurring), and the *Tincher* Court did not adopt that statement as Pennsylvania law. *Id.* at 32. Similarly, Sullivan notes that Appellants purport to quote

---

> provision of reasonable instructions or warnings by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the instructions or warnings renders the product not reasonably safe.

RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2. Additionally, the Third Restatement specifically addresses compliance evidence as follows:

> In connection with liability for defective design or inadequate instructions or warnings:
>
> (a) a product's noncompliance with an applicable product safety statute or administrative regulation renders the product defective with respect to the risks sought to be reduced by the statute or regulation; and
>
> (b) a product's compliance with an applicable product safety statute or administrative regulation is properly considered in determining whether the product is defective with respect to the risks sought to be reduced by the statute or regulation, but such compliance does not preclude as a matter of law a finding of product defect.

*Id.* § 4.

*Tincher* for the notion that it "tempered [strict liability] by a negligence-based concept of defect," when that is also a quote from then-Justice Saylor's concurrence in *Phillips*, not a statement of the *Tincher* Court. *Id.* at 32-33. Further, Sullivan asserts that Appellants incorrectly portray *Tincher* as stating that the risk-utility test "has all the earmarks of determining negligence," where that was the *Tincher* Court's parenthetical description of the Supreme Court of Illinois' decision in *Blue v. Environmental Engineering, Inc.*, 828 N.E.2d 1128, 1140-41 (Ill. 2005), and not a statement of Pennsylvania law. *Id.* at 33-34. Accordingly, Sullivan argues that Appellants' brief "repeatedly quotes *Tincher* out-of-context in support of its theme that *Tincher* supposedly dismantled the wall between negligence and strict liability[.]" *Id.* at 34.

Sullivan continues that our decision in *Roverano v. John Crane, Inc.*, 226 A.3d 526 (Pa. 2020), shows that our Court has preserved the distinction between negligence and strict liability claims. *Id.* at 35. In concluding that Pennsylvania's Fair Share Act did not require a jury to apportion strictly liable defendants' shares of liability on a percentage basis, Sullivan notes that our Court "reaffirmed that 'strict liability is 'liability without fault.'"" *Id.* at 37 (quoting *Roverano*, 226 A.3d at 538). Sullivan recognizes that we explained that negligence notions are not applicable in strict liability based on *Tincher*'s statement that "the tortious conduct at issue [in strict liability] is not the same as that found in traditional claims of negligence and commonly associated with the more colloquial notion of 'fault.' In this sense, introducing a colloquial notion of 'fault' into the conversation relating to strict product liability in tort detracts from the precision required to keep this legal proposition within rational bounds." *Id.* at 37 (quoting *Roverano*, 542-43) (brackets added). Based on our analysis in *Roverano*, Sullivan argues Appellants' claim that *Tincher* made strict liability "more negligence-like" is inapt, and Sullivan faults Appellants for failing to acknowledge *Roverano*. *Id.* at 39.

Responding to Appellants' reliance on persuasive authority, Sullivan urges us to look to post-*Tincher* Pennsylvania intermediate court rulings. *Id.* at 40. Sullivan highlights that the Superior Court in *Webb* concluded that *Tincher*'s overruling of *Azzarello* did not undermine the evidentiary rule of *Lewis* and *Gaudio*. *Id.* at 40-41. Additionally, in *Dunlap v. Federal Signal Corp.*, 194 A.3d 1067 (Pa. Super. 2018), Sullivan notes the Superior Court affirmed the exclusion of compliance evidence at the summary judgment stage to establish the effectiveness of the plaintiff's alternate design. *Id.* at 42-43. Sullivan points out that the Superior Court's decision in this case was consistent with *Webb* and *Dunlap*. Here, in Sullivan's account, the Superior Court acknowledged the risk-utility factors supplied by Dean John Wade[9] and listed in *Tincher*, but it did not see the relevance of compliance evidence to those factors. *Id.* at 44. Rather, Sullivan agrees with the Superior Court that compliance evidence is not relevant under Section 402A because Section 402A imposes liability regardless of the seller's care, and compliance evidence shows only due care. *Id.* at 46.[10]

In response to Appellants' citation to other states' rulings on compliance evidence, Sullivan initially notes that fourteen other states' highest courts permit compliance

---

[9] *See infra* p.22-23 n.11.

[10] *Amici curiae* American Association for Justice, Pennsylvania Association for Justice, *et al.* (AAJ), argue that "unreasonably dangerous" applies to the nature of the product, not to the manufacturer's conduct in complying with industry or government standards. Thus, Appellants' approach of focusing on compliance is not relevant to the issue of whether the product was unreasonably dangerous and defectively designed. "The conduct of the manufacturer should not be judged by reference to other manufacturers; it is the **product** which must be judged as either sufficient or deficient, a focus that the *Tincher* court reaffirmed." AAJ's *Amici* Br. at 25 (emphasis in original).

Similarly, *amici curiae* The Center for Auto Safety and The Attorneys Information Exchange Group (CAS) argue that compliance evidence goes to the manufacturer's due care and distracts the jury's focus from the facts of the case and the product at issue. CAS's *Amici* Br. at 8, 16.

evidence under certain circumstances. *Id.* at 55. Sullivan claims, without citation, that some of these jurisdictions follow the Third Restatement while one does not recognize strict liability causes of action (Delaware). *Id.* at 56 (citing *Cline v. Prowler Indus. of Md., Inc.*, 418 A.2d 968 (Del. 1980)). Sullivan distinguishes California's approach because that state shifts the burden of proof to defendants to prove that the product is not defective after the plaintiff shows the product caused an injury. *Id.* Additionally, Sullivan notes that the Supreme Court of Illinois, in the *Calles* decision Appellants cite, held a plaintiff can introduce evidence of a defendant's noncompliance with industry or government safety standards, but it did not hold a defendant can introduce evidence of its compliance with such standards. *Id*. at 62 n.3 (discussing *Calles*, 864 N.E.2d at 260).

Regarding Appellants' invocation of Pennsylvania Rules of Evidence 401 and 402, Sullivan contends Appellants waived their argument by failing to raise it in the trial court and the Superior Court. *Id.* at 47-49. In addition to the Rules of Evidence argument, Sullivan contends Appellants have waived any argument that *stare decisis* considerations weigh in favor of overruling *Lewis*. *Id.* at 52. Moreover, Sullivan argues *stare decisis* considerations counsel against overruling *Lewis*, raising the legislature's inaction since *Lewis* was issued in 1987 and the potential upheaval in product liability cases from overruling *Lewis*. *Id.* at 53-55. For these reasons, Sullivan asks us to affirm the Superior Court's decision that compliance evidence remains inadmissible post-*Tincher*.

In their reply brief, Appellants dismiss Sullivan's waiver argument as "hypertechnical" and contend their invocation of the Rules of Evidence simply provides additional legal authority in support of their basic theory that *Lewis* is no longer good law. Appellants' Reply Brief at 1 n.1 (citing *HIKO Energy, LLC v. Pa. Pub. Util. Comm'n*, 209 A.3d 246, 262 (Pa. 2019)). On the merits, Appellants reiterate the main points from their principal brief described above. In sum, Appellants' view is that compliance evidence is

admissible but not dispositive. Appellants acknowledge that if a trial court finds the evidence unhelpful or prejudicial, it may exclude it under Pa.R.E. 403. Appellants conclude that "[s]tandards compliance is relevant evidence in product liability litigation, and consistent with *Tincher* and Pennsylvania law, juries should hear all relevant evidence—nothing more, nothing less. The Court should allow juries to weigh this evidence in their deliberations and to give it the weight they believe it deserves." *Id.* at 26.

## V. ANALYSIS

We conclude that evidence of compliance with industry standards is inadmissible under the risk-utility test in strict products liability cases. In this regard, we reaffirm the post-*Tincher* validity of the rule announced in *Lewis*.

As discussed above, in *Lewis*, this Court concluded that evidence of industry standards and a product's widespread design within an industry "go to the reasonableness of the [defendant's] conduct in making its design choice, [and] that such evidence would have improperly brought into the case concepts of negligence law." *Lewis*, 528 A.2d at 594. The *Lewis* Court explained that the proper focus of a design defect case is on the characteristics of the product and not the conduct of the manufacturer. *Id.* at 593. The Court recognized that *Azzarello* was "in harmony" with focusing on the product and prohibiting the introduction of "negligence concepts" in strict liability cases, and the Court further emphasized that "the Restatement (Second) of Torts makes it clear that the imposition of strict liability for a product defect is not affected by the fact that the manufacturer or other supplier has exercised 'all possible care.'" *Id.* The *Lewis* Court also reasoned that industry standards evidence "would have created a strong likelihood of diverting the jury's attention from the [defendant's product] to the reasonableness of the [defendant's] conduct in choosing its design." *Id.* at 594.

Accordingly, *Lewis* held compliance evidence was inadmissible as it had "a tendency to distract the jury from its main inquiry or confuse the issue." *Id.*

Although *Tincher* overruled *Azzarello*, it did not overrule *Lewis* or criticize its reasoning. In returning to the jury the decision of whether to impose strict liability, the *Tincher* Court emphasized strict liability remained a distinct theory from negligence:

> Nevertheless, the tortious conduct at issue [in strict product liability] is not the same as that found in traditional claims of negligence and commonly associated with the more colloquial notion of 'fault.' In this sense, introducing a colloquial notion of 'fault' into the conversation relating to strict product liability in tort detracts from the precision required to keep this legal proposition within rational bounds.

*Tincher*, 104 A.3d at 400. Further, while recognizing that strict liability "overlaps in effect with the theories of negligence **and** breach of warranty," the Court distinguished strict liability as "effectuat[ing] a further shift of the risk of harm onto the supplier than either negligence or breach of warranty theory by combining the balancing of interests inherent in those two causes of action." *Id.* at 401-02 (emphasis in original). The duty involved in strict liability—to produce and/or market a product without "a defective condition unreasonably dangerous"—is different from the duty of due care in negligence. *Id.* at 383 (quoting RESTATEMENT (SECOND) OF TORTS § 402A(2)).

To prove a breach of this duty in design defect cases, *Tincher* replaced the *Azzarello* standard with a "composite test" in which the consumer-plaintiff may show a defective condition through either (or both) the consumer expectations test or the risk-utility test. *Id.* at 401. In its thorough exposition of the development of strict liability, the Court explained that the consumer expectations test, based on the consumer's expectation that a seller placing a product on the market impliedly represents the product is not unreasonably dangerous, derived from the breach of warranty roots of strict liability. *Id.* at 402-03. Meanwhile, the risk-utility test, focusing on the manufacturer's risk-benefit

calculus, reflected its negligence strands. *Id.* at 403-04. Regardless of which test is used, the duty is to provide a product free from a defective condition unreasonably dangerous to the consumer, and liability may be incurred irrespective of fault. *Id.* at 403 (recognizing all definitions of defect "effectuat[e] the single policy that those who sell a product are held responsible for damages caused to a consumer by the reasonable use of the product."). In articulating the composite test to prove a defect, the *Tincher* Court did not address the viability of the *Lewis* rule going forward. *Id.* at 410.

We examine the *Lewis* rule in light of the factors that a jury must consider when applying the risk-utility test. Under the risk-utility standard, "a product is in a defective condition if a 'reasonable person' would conclude that the probability and seriousness of harm caused by the product outweigh the burden or costs of taking precautions." *Id.* at 389. In its discussion of the risk-utility standard, the *Tincher* Court enumerated the risk-utility factors identified by Dean Wade,[11] but noted the difficulty using those factors in a

_____

[11] The so-called "Wade factors" are:

> (1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.
>
> (2) The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury.
>
> (3) The availability of a substitute product which would meet the same need and not be as unsafe.
>
> (4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.
>
> (5) The user's ability to avoid danger by the exercise of care in the use of the product.
>
> (6) The user's anticipated awareness of the dangers inherent in the product and their availability, because of general public

(continued…)

typical design defect case. *Id.* Instead, the *Tincher* Court adopted the composite test as set forth by the California Supreme Court in *Barker v. Lull Engineering Co.*, 573 P.2d 443 (Cal. 1978), which contained a nonexclusive list of risk-utility factors: "the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design." *Barker*, 573 P.2d at 455.[12] As noted above, the trial court in this case instructed the jury to consider the following factors, which are verbatim six of the Wade factors:

> The usefulness and desirability of the product, its utility to the user and to the public as a whole, the safety aspects of the product, the likelihood that it will cause injury, and the probable seriousness of the injury, the availability of a substitute product which would meet the same need and not be as unsafe, the manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility, the user's ability to avoid danger by the exercise of care in the use of the product, the user's anticipated awareness of the dangers inherent in the product and their availability, because of the general public knowledge of the obvious condition of the product or the existence of suitable warnings or instructions.

---

> knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.
>
> (7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.

*Tincher*, 104 A.3d at 389-90 (quoting John W. Wade, *On the Nature of Strict Tort Liability for Products*, 44 Miss. L.J. 825, 837-838 (1973)).

[12] The Pennsylvania Suggested Standard Civil Jury Instructions (PA-JIICIV) are modeled after the *Barker* factors. *See* PA-JIICIV 16.20 and Subcommittee Note.

N.T., 5/9/19, at 113-14.  Regardless of the formulation of the risk-utility test, the focus is clearly on the characteristics of the product.

We reaffirm *Lewis* and hold that evidence of a product's compliance with governmental regulations or industry standards is inadmissible in design defect cases to show a product is not defective under the risk-utility theory.  To be clear, compliance evidence is simply evidence of the ultimate conclusion that a product complies with government regulations or industry standards, *i.e.*, that a government agency or industry organization would deem the product not defective.  It is not evidence of the underlying attributes of the product that make it compliant with regulations or standards, which is presumably admissible subject to the ordinary Rules of Evidence.  We agree with the *Lewis* Court's assessment that the focus of a design defect case must be limited to the characteristics of the product, and not the conduct of the manufacturer or seller.  *See Lewis*, 528 A.2d at 593.  Compliance evidence does not prove any characteristic of the product; rather, it diverts attention from the product's attributes to both the manufacturer's conduct and whether a standards-issuing organization would consider the product to be free from defects.  Neither of these considerations are pertinent to a risk-utility analysis.

The standards that the trial court ruled inadmissible were issued by OSHA and ANSI.  Because Appellants did not submit the standards to the trial court in the form of an offer of proof when the trial court ruled on the motion in limine, it is unclear which specific standards Appellants sought to introduce.[13]  Generally, those standards govern conduct.  OSHA standards seek to regulate the conduct of employers and employees to

---

[13] Even agreeing with the evidentiary concerns expressed in Justice Donohue's concurring opinion, our analysis remains apt as evidence that a manufacturer designed its product to conform to ANSI, OSHA, or any third-party standards goes to the manufacturer's due care in designing a product and results in a sub-trial on the weight due to those standards," which diverts the jury's focus from the product.  *See* Concurring Op. (Donohue, J.) at 7-8.  Again, the focus is on the product's characteristics, not the manufacturer's conduct.

ensure safe and healthful working conditions. *See generally* 29 U.S.C. § 651. ANSI standards seek to regulate a manufacturer's conduct in designing and manufacturing a product. Accordingly, compliance with those standards reflects on the manufacturer's conduct and not any attribute of the product itself. That OSHA or ANSI would deem a defendant's conduct compliant with its standards is not relevant to the risk-utility test and diverts the jury's attention from the relevant inquiry.

We disagree with Appellants that "*Tincher* demolished *Lewis*' *Azzarello*-based reasoning." Appellants' Brief at 26. As discussed above, *Lewis* based its exclusion of compliance evidence on both *Azzarello* and Section 402A of the Second Restatement. *See Lewis*, 528 A.2d at 594. *Tincher* reaffirmed that Pennsylvania is a Second Restatement jurisdiction. Further, to maintain the distinction between strict liability and negligence, we cannot permit negligence concepts such as fault and due care to creep into strict liability. *See Tincher*, 104 A.3d at 400 ("introducing a colloquial notion of 'fault' into the conversation relating to strict product liability in tort detracts from the precision required to keep this legal proposition within its rational bounds."). Compliance evidence shifts the jury's focus away from the characteristics of the product and suggests that the jury consider the manufacturer's conduct or an organization's safety standards. While Appellants assert that compliance evidence is relevant to whether a product is unreasonably dangerous and the condition of the product, evidence that a third-party does not consider the product defective or that a manufacturer complied with those standards does have any tendency to make any of the risk-utility factors outlined above more probable.

In essence, Appellants are proposing that we adopt the Third Restatement of Torts' approach to compliance evidence, which states that "a product's compliance with an applicable product safety statute or administrative regulation is properly considered in

determining whether the product is defective with respect to the risks sought to be reduced by the statute or regulation, but such compliance does not preclude as a matter of law a finding of product defect." RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 4. However, *Tincher* refused to adopt the Third Restatement, explaining its approach was "problematic" for numerous reasons, including that its limitation of strict liability to cases where an alternate design existed and its special evidentiary rules (including its position on compliance evidence in Section 4) may not be "consistent with the public policy that compensation is available for an injury caused by **any** type of defective product." *Tincher*, 104 A.3d at 395-96. Ultimately, *Tincher* concluded the Third Restatement's approach was an insufficient reflection of the law and decided to retain the Second Restatement, explaining "[u]nlike the Third Restatement, we believe that the Second Restatement already adopted, and properly calibrated, permits the plaintiffs to tailor their factual allegations and legal argumentation to the circumstances as they present themselves in the real-world crucible of litigation, rather than relying upon an evidence-bound standard of proof." *Id.* at 399. Because *Tincher* considered and rejected the Third Restatement, we reject Appellants' attempt to move us toward the Third Restatement in this case.

Further, Appellants' argument that *Tincher* recognized that strict liability and negligence overlap is misplaced. As explained above, *Tincher* recognized that the risk-utility test reflects the negligence roots of strict liability. However, *Tincher* did not adopt the risk-utility test to incorporate negligence concepts such as fault and due care into strict liability. Instead, *Tincher* was careful to distinguish the duty involved in strict liability from the duty of due care in negligence. *See Tincher*, 104 A.3d at 383. One method to prove a product was in a "defective condition unreasonably dangerous," *i.e.*, in breach of the strict liability duty, is the risk-utility test. *Tincher* rejected Appellants' position that this test

incorporates negligence considerations. *See id.* at 400 ("the tortious conduct at issue is not the same as that found in traditional claims of negligence and commonly associated with the more colloquial notion of 'fault.'").

Lastly, Appellants' argument that our decision places Pennsylvania in a minority position regarding the inadmissibility of compliance evidence is unavailing. Our decision is based on our analysis and application of Pennsylvania precedent regarding the development of strict product liability. We adhere to Section 402A's principle that strict liability may be imposed even if a defendant exercised "all possible care." Strict liability remains distinct from negligence in that it imposes liability without fault. It reflects the "social and economic policy of this Commonwealth," which is that "those who sell a product (*i.e.,* profit from making and putting a product in the stream of commerce) are held responsible for damage caused to a consumer by the reasonable use of the product. The risk of injury is placed, therefore, upon the supplier of the products." *Tincher*, 104 A.3d at 381-82 (citations omitted). The focus in a design defect case must remain on the product and not on the manufacturer's conduct. Accordingly, we conclude that *Lewis* remains the law and evidence of a products' compliance with industry or government standards is not admissible in design defect cases to show a product is not defective under the risk-utility theory.

## VI. CONCLUSION

For these reasons, we affirm the Superior Court's decision that the trial court did not abuse its discretion in granting Sullivan's motion in limine to preclude the admission of any industry or government standards at trial.

Justices Dougherty and Wecht join the Opinion Announcing the Judgment of the Court.

Justice Donohue files a concurring opinion.

Chief Justice Todd files a dissenting opinion in which Justice Brobson joins.